# JAMES SZYMANSKI *vs.* BOSTON MUTUAL LIFE INSURANCE COMPANY.

No. 99-P-1756.

Suffolk. March 7, 2002. - November 7, 2002.

Present: BROWN, DREBEN, & DOERFER, JJ.

*Limitations, Statute of. Insurance,* Life insurance, Premiums. *Fraud. Consumer Protection Act,* Insurance. *Contract,* Insurance.

In an action by an insured against his insurer for breach of contract, fraud, and violation of G. L. c. 93A, arising from promotional materials and representations made by the insurer's agent that a so-called "vanishing-premiums" life insurance policy sold to the insured would accumulate sufficient value in nine years to cover the cost of the annual premiums thereafter, summary judgment for the insurer, on the basis that a reasonable policy holder in the insured's position should have known or should have inquired, prior to a certain date, about the policy's diminishing performance and its implications for future premium payments, was not warranted, where there was a jury question as to when a reasonable policy holder in the insured's position should have been alerted by the information available that the policy was not performing as allegedly promised and that the so-called vanishing premiums were a fiction. [370-380]

In an action by an insured against his insurer for breach of contract, fraud, and violation of G. L. c. 93A, there was no merit to the insured's contentions for tolling the limitations period pursuant to the discovery rule that the insurer fraudulently concealed the insured's cause of action, where there was no affirmative act or concealment; or that the insurer had a fiduciary duty to disclose certain information to the insured, where there was nothing in the relationship between the parties that would have given rise to a heightened duty of disclosure. [380-382]

This court declined to consider a civil defendant's claim, as an alternative ground for entering summary judgment in its favor, that the plaintiff's several counts in his complaint failed to state a claim upon which relief could be granted, where the motion judge did not reach the issue, having allowed the defendant's motion for summary judgment on the basis of its statute of limitations defense; the court also declined to consider an argument by the plaintiff, raised for the first time on appeal, with regard to the time of the accrual of his action. [382-383]

CIVIL ACTION commenced in the Superior Court Department on February 18, 1998.

The case was heard by *Peter M. Lauriat,* J., on a motion for summary judgment.

*Douglas M. Brooks* for the plaintiff.

*Beth I.Z. Boland (William M. Cowan* with her) for the defendant.

*Victoria E. Fimea, Evan M. Tager, & Peter C. Choharis,* for American Council of Life Insurers, amicus curiae, submitted a brief.

*Thomas F. Reilly,* Attorney General, & *Matthew S. Buehler & Thomas M. O'Brien,* Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.

BROWN, J. At issue is the defendant insurer's promotional materials and representations made by its insurance agent indicating that a so-called "vanishing-premiums" life insurance policy sold to the plaintiff would accumulate sufficient value in nine years to cover the cost of the annual premiums thereafter.[1] A judge of the Superior Court allowed the defendant's motion for summary judgment on the basis of statutes of limitations. We reverse.

*Background.* In 1986, the plaintiff, James Szymanski,[2] then a foreman with an associate's degree in manufacturing, owned a fully paid $5,000 life insurance policy with Boston Mutual Life Insurance Company (Boston Mutual). In March, 1986, William Pittella, a Boston Mutual agent, told Szymanski about a new kind of Boston Mutual life insurance policy that operated so that annual premium payments would vanish in a fixed number of years. Pittella suggested that Szymanski's existing $5,000 policy could be used to pay a portion of the premiums for a new policy, which afforded a death benefit of $25,000 and the premiums for which would "vanish" after nine years.

Szymanski purchased the vanishing-premiums policy in May, 1986, paying his initial premium from dividends on his existing $5,000 policy. When the policy was mailed to Szymanski in May, 1986, it was accompanied by two illustrations that showed projected policy values over the next twenty years. The first il-

---

[1]We acknowledge amicus curiae briefs filed by the Attorney General and the American Council of Life Insurers.

[2]The proposed class has not been certified.

lustration demonstrated that after nine years Szymanski's premiums could be paid from the accumulated value of his policy, so that no further out-of-pocket premiums would be required. The second indicated that continued payment of out-of-pocket premiums after the ninth year could increase the policy's death benefit significantly. Both illustrations utilized what was described as the "current" interest rate of 10.5 percent, though stating that the rate was not guaranteed beyond the first policy year. The following year, the plaintiff surrendered the $5,000 policy to pay the annual premiums on the new policy. The proceeds from that policy paid Szymanski's premiums until 1992; Szymanski thereafter received an annual premium bill, which he paid out of pocket. Pursuant to the policy terms, each May Szymanski also received an annual statement from Boston Mutual, showing the accumulated value of his policy and the interest rate for the coming year. After the first year of the policy, the annual statement showed that the rate would drop to 9.0 percent; the rate continued to drop over the next eight years.

In May, 1996, ten years after purchasing the policy, Szymanski received an "additional premium bill" and, upon inquiry to his agent, he was made to understand that he would have to make twenty or more payments before the policy would become self-funding.

Szymanski filed the original complaint in this action on February 18, 1998 (amended on May 11, 1998), claiming, among other things, breach of contract, fraud, and violation of G. L. c. 93A. A Superior Court judge allowed Boston Mutual's motion for summary judgment on the basis of the statutes of limitations[3] that pertain to causes of action for contract (six years), tort (three years), and G. L. c. 93A (four years). The judge reasoned that Szymanski was on notice at least by the

---

[3]In Massachusetts a statute of limitations begins to run when the plaintiff learned or should reasonably have learned that he has been harmed, and not when the plaintiff learned of the extent or precise measure of harm. See *Williams* v. *Ely*, 423 Mass. 467, 475 (1996). Accrual of a claim is not postponed due to "[u]ncertainty about the total extent of the damages." *Swasey* v. *Barron*, 46 Mass. App. Ct. 127, 132 (1999). Compare *Gaidon* v. *Guardian Life Ins. Co. of America*, 96 N.Y.2d 201, 210 (2001) (under New York law, commencement of limitations period is triggered "when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief").

1987 annual statement, when the interest rate dropped from 10.5 percent to 9.0 percent, that his premiums would not vanish as promised.[4]

We conclude that the triggering event cannot be pinpointed as matter of law, but poses a question of fact as to when a reasonable policy holder should have realized from the available information that the policy was not performing as allegedly promised and that the so-called vanishing premiums were a fiction. "In most instances, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact." *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 229 (2002).

A. *The discovery rule.* Actions in both contract and tort may be tolled until such time as the plaintiff discovers the facts giving rise to the cause of action. *Frank Cooke, Inc.* v. *Hurwitz*, 10 Mass. App. Ct. 99, 106 (1980). The discovery rule also applies to actions based on G. L. c. 93A. See *International Mobiles Corp.* v. *Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 221 (1990). In opposing the defendant's motion for summary judgment on the basis of the statutes of limitations, Szymanski relied on the discovery rule, arguing that he did not discover, or was prevented from discovering until the 1996 premium bill, that the vanishing-premiums policy would not operate as promised. "The rule, which operates to toll a limitations period until a prospective plaintiff learns or should have learned that he has been injured, may arise in three circumstances: where a misrepresentation concerns a fact that was 'inherently unknowable' to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the exist-

---

[4]Consumer disappointment with vanishing-premiums policies has sparked considerable litigation nationwide. See, e.g., *McCord* v. *Minnesota Mut. Life Ins. Co.*, 138 F. Supp. 2d 1180, 1183 n.4 (D. Minn. 2001), and case cited. The amicus brief of the Attorney General also reports that "[t]he Attorney General has entered into consent decrees regarding the sale of vanishing premium policies with the two largest life insurers in Massachusetts — John Hancock Mutual Life Insurance Company, Suf. Sup. Ct. C.A. # 98-1542, and Prudential Insurance Company of America, Suf. Sup. Ct. [C.A. #] 97-3070," and that the Attorney General's office has received "approximately 50,000 calls since May 1997 and roughly 800 formal written complaints since September 1997 regarding deceptive insurance sales practices, most of which have involved vanishing premium policies."

ence of a cause of action through some affirmative act done with the intent to deceive." *Patsos* v. *First Albany Corp.*, 433 Mass. 323, 328 (2001). The plaintiff relies on all three theories.

1. *Inherently unknowable standard.* In Massachusetts, when a plaintiff can not reasonably ascertain the injury or breach at the time it occurred, his cause of action accrues when the plaintiff knows or should know that he has suffered appreciable harm resulting from the defendant's actions. *Schwartz* v. *Travelers Indem. Co.*, 50 Mass. App. Ct. 672, 678 (2001). The " 'inherently unknowable' standard is no different from and is used interchangeably with the 'knew or should have known' standard." *Albrecht* v. *Clifford*, 436 Mass. 706, 714 (2002), citing *Williams* v. *Ely*, 423 Mass. 467, 473 n.7 (1996). When, as here, the parties press different events as triggering accrual, the factual inquiry focuses on which was the first event reasonably likely to put the plaintiff on notice that the defendant's conduct had caused him injury. See *Eck* v. *Kellem*, 51 Mass. App. Ct. 850, 853 (2001). "Notice here refers not to discovery of every fact necessary to prevail on the claim, but rather to discovery of the plaintiff's injury as causally connected to the defendant's negligence." *International Mobiles Corp.* v. *Corroon & Black/ Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. at 218. The plaintiff may be put on "inquiry notice" when he is informed of the facts that suggest he has been injured. *Pagliuca* v. *Boston*, 35 Mass. App. Ct. 820, 824 (1994), citing *Felton* v. *Labor Relations Commn.*, 33 Mass. App. Ct. 926, 927-928 (1992). It is important to remember that notice is predicated on the view of a reasonably prudent person in the plaintiff's position. See generally *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 210 (1990).

Boston Mutual contends that Szymanski's claims accrued in 1986, when he first received his policy containing no reference to the vanishing of his premiums after eight years, but rather requiring that premiums be paid through 2041. The defendant additionally urges that, at least by 1992, the plaintiff knew from the annual statements that interest rates had dropped to 8.25 percent and that, as a consequence, the policy's accumulated value would not pay the premiums after nine years. At that point, the defendant argues, the plaintiff should have at least inquired about the declining interest rates and would then have

discovered that additional out-of-pocket premiums would be necessary beyond the vanishing date originally represented.

The plaintiff maintains that his cause of action accrued in 1996, when he received his first bill to pay out-of-pocket for an annual premium beyond the date he thought his premiums would vanish. He claims that he did not understand that the annual statements sent to him between 1986 and 1995 contained information revealing that the accumulated value of his policy could not possibly cover the cost of premiums, as had been represented to him when he executed the policy.

A review of the vanishing-premiums cases from other jurisdictions offers no uniform rule regarding the accrual date of these actions. In deciding the limitations issue those cases often go into exhaustive detail in describing the information made available to the policy holder, what it should have meant from the policy holder's perspective, and when it should have prompted inquiry.[5]

The critical determination in a summary judgment context is whether, as matter of law, we can identify the point at which Szymanski should have known or should have made inquiry, based on the information available to him, about the shortfall in the accumulated value of his policy that·would preclude covering the cost of annual premiums at the end of nine years. We now review the materials in the summary judgment record.

a. *The 1986 illustrations.* In 1986, two illustrations were sent to Szymanski with his policy. The first illustration, the more significant for our purposes, shows the column for annual

---

[5]One example of the fact-sensitive nature of the analysis is the recent case of *Parkhill* v. *Minnesota Mut. Life Ins. Co.*, 286 F.3d 1051, 1056-1057 (8th Cir. 2002). Some of the triggering events in *Parkhill* were as follows. Though initially told by the insurance agent in 1986 that their policy would be self-sustaining following a one-time premium payment, the Parkhills were billed for additional premiums in 1987. In 1988, their agent represented that they could increase their coverage without any out-of-pocket premiums; again, they received premium bills from the insurer for the next two years, which they paid by surrendering two other policies. Thereafter, the plaintiffs received annual statements showing negligible dividends, culminating in a 1990 illustration from the insurance company demonstrating that their policy was due to expire in 1994 under the guaranteed interest rate, unless they made additional out-of-pocket payments. In an action filed in 1997 that was governed by a six-year statute of limitations, the court of appeals ruled that the plaintiff's claim was time-barred.

premiums stopping at year nine. Both 1986 illustrations indicate that the plaintiff's policy would become self-sustaining, that is, require no further out-of-pocket premiums, after the ninth year based on the then-current interest rate of 10.5 percent. In tiny print at the bottom of the page, in reference to the ninth-year figures on the chart, the illustrations state that "[b]ased on current rates, the projected accumulated fund value at the end of the year indicated is sufficient to pay all future premiums as they come due." An additional column lists the guaranteed cash value for the same years, but does not indicate the effect of the guaranteed interest rate on the payment of premiums over time.

The second 1986 illustration shows that, at the current rate, continued out-of-pocket payments of annual premiums after the ninth year would operate to increase the death benefit from $25,000 to $39,574; again, no explanation regarding premiums or interest rates accompanied the guaranteed cash value column.

The illustrations contained the following disclaimer: "The current interest rate of 10.5 [percent] is guaranteed for the first policy year. Projected values for all subsequent years are based on this current rate and current mortality charges, neither of which is guaranteed."

Szymanski emphasizes what the illustrations did not tell him. One significant omission is any indication that what Boston Municipal described as its "current" interest rate of 10.5 percent guaranteed for the first year was not representative of the company's actual investment performance. Boston Mutual's internal memoranda, though dated 1988, support the reasonable inference that the 10.5 percent interest rate, upon which the projections in the 1986 illustrations were based, was inflated by the insurer in order to make the policies more marketable.[6] The documentary evidence and reasonable inferences drawn therefrom support the plaintiff's assertion that the 10.5 percent interest rate used in the illustration was completely unrealistic and was incapable of being sustained. Yet despite its failure to disclose that the 10.5 percent did not reflect actual investment performance and could not reasonably be anticipated in the future, Boston Mutual relies on the disclaimer in its illustrations

[6]The actual interest rate was closer to 9.5 percent.

that the rate was not guaranteed as sufficient to put the plaintiff on notice that the rates could decline drastically in subsequent years, wiping out any possibility of vanishing premiums.

Disclaimers that have relieved insurers of liability for using high interest rates in their marketing illustrations are more informative than Boston Mutual's disclaimer here. See, e.g., *Frith* v. *Guardian Life Ins. Co. of America*, 9 F. Supp. 2d 734, 740 (S.D. Tex. 1998) ("actual future dividends may be higher or lower than those illustrated depending on the Company's actual future experience"); *In re Northwestern Mut. Life Ins. Co. Sales Practices Litigation*, 70 F. Supp. 2d 466, 488 (D.N.J. 1999), aff'd (without published opinion), 259 F.3d 716 (3d Cir. 2001) (plaintiff received several different illustrations based on differing premiums and death benefits, each stating in bold letters that dividends were not guaranteed to remain at level illustrated); *Von Hoffmann* v. *Prudential Ins. Co. of America*, 202 F. Supp. 2d 252, 254 (S.D.N.Y. 2002) (illustrations accompanied by disclaimer that investment returns were not guaranteed and that if investments failed to perform as predicted, additional premiums would be required beyond vanishing date shown in illustration). Moreover, Boston Mutual's disclaimer failed to disclose the immoderate effect that even a slight but perpetual decline in interest rates would have on the policy holder's out-of-pocket premium payments.

While the 1986 illustrations in this case state that the interest rate of 10.5 percent was not guaranteed, a jury could reasonably infer that this artificially inflated interest rate lulled the plaintiff into believing the rates had a realistic chance of remaining at that level or that, upon declining, might return to that level, or even surpass it, in subsequent years. The plaintiff could not have known that the interest rates in the initial illustrations were unrealistically high and would never recur in the ensuing nine years, thereby requiring additional premium payments. See, e.g., *Gaidon* v. *Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 350 (1999) (*Gaidon I*) (disclaimer that interest rates were not guaranteed did not go far enough in disclosing "practical implications" of declining rates where "[a]lthough they did not guarantee that interest rates would remain constant, they failed to reveal that the illustrated vanishing dates were

wholly unrealistic"). See also *Von Hoffmann* v. *Prudential Ins. Co. of America*, 202 F. Supp. 2d at 261 (use of past performance history in vanishing-premiums illustration to induce purchase of policy was misleading where broker failed to disclose that new dividend methodology could affect future dividends).

Thus, while Szymanski did receive annual statements indicating decreases in the interest rates over subsequent years, a jury could conclude that he had insufficient information to alert him that additional premium payments would be required as a result, or that he was viewing the information in the context of false expectations and may well have reasonably anticipated that rates might return to, or go higher than, the level in the illustrations. A jury could find that it was the very essence of the marketing strategy behind the vanishing-premiums sales pitch to create a false sense of security and complacency whereby the policy holder continued to pay premiums for several years based on unrealistic expectations of the policy's future value. See *Gaidon I*, 94 N.Y. 2d at 345 ("[t]he very goal of the marketing scheme was to convince prospective purchasers that the vanishing date would in fact conform to the individualized projections").

b. *The policy.* It is true that the 1986 policy sent to Szymanski makes no mention of "vanishing premiums." As the defendant points out, the 1986 policy required premiums to be paid once a year through 2041. See, e.g., *In re Northwestern Mut. Life Ins. Co. Sales Practices Litigation*, 70 F. Supp. 2d at 485-486 (policy holder should have been prompted to inquire when he received policy requiring fifty-six years of premium payments, instead of three years as promised). We do not view that provision as necessarily inconsistent with the promise of vanishing premiums, however. The whole premise of vanishing premiums is that premiums would continue to be paid, but paid out of the accumulated value of the policy, instead of out of the policy holder's pocket. See, e.g., Darconte *vs.* Berkshire Life Ins. Co., U.S. Dist. Ct., No. Civ. A. 97-11413 (D. Mass. Mar. 30, 2002) (even though policy indicated that premiums would be due every year throughout insured's life, illustration indicating future payments would be made out of dividends created disputed issue of fact as to how parties intended premiums to be

paid after seventh year, where words "disappearing premium" were incorporated into policy). See also *Williamson* v. *Indianapolis Life Ins. Co.*, 741 So. 2d 1057, 1060 (Ala. 1999).

Moreover, this policy, though not specifically providing that the premiums would vanish after nine years, does refer to the potential for the policy to become self-sustaining after six years pursuant to a "Special Premium Payment Option."[7] The policy summary similarly explained that "[y]our policy will also develop a cash value which is available to you if you stop paying premiums. You may either take it in cash or use it to buy continuing insurance protection." Viewed in the context of the 1986 illustrations, which were sent to Szymanski along with the policy, a reasonable person could understand this provision to mean that, while premiums would be due each year, the interest on the accumulated value eventually would be enough to pay those premiums. As such, we do not think the policy language requiring annual premiums to be paid until 2041 sufficient to put the plaintiff on notice that the promise of vanishing premiums was suspect.

Boston Mutual further contends that the plaintiff should have noticed, in the course of reviewing the policy, that the policy's provision setting the guaranteed interest rate at 4.0 percent was inconsistent with the rate shown in the illustrations. We note, however, that projections using the guaranteed 4.0 percent rate were included in the 1986 illustrations side-by-side with the 10.5 percent rate, but without any indication that out-of-pocket premiums would extend beyond nine years, indeed beyond the twenty-year mark, at that rate. Furthermore, the plaintiff could reasonably have understood that the actual current interest rate would be higher than the policy's guaranteed 4.0 percent rate, without being put on notice that the 1986 rate was unrealisti-

---

[7]The provision, entitled "Special Premium Payment Option," states, in relevant part: "On the 6th Policy Anniversary, or any policy anniversary thereafter, provided there is no outstanding loan on the policy, if the Excess Cash Value is greater than or equal to the Total Annual Premium for your Policy, you may elect not to pay your Total Annual Premium. If you elect not to pay your premium as of that Policy Anniversary, we will reduce your Accumulated Value by the Total Annual Premium and pay that amount for you as the Total Annual Premium."

cally high or otherwise raising his suspicions.[8] The significance of the policy's guaranteed interest rate of 4.0 percent to an insurance consumer in the plaintiff's position was a question of fact.

c. *The annual statements.* Last, we examine the information contained in the annual statements sent to Szymanski from 1987 to 1995. The 1986 policy explained that annual statements would be furnished to the policy holder and that they would contain information about the value of the plaintiff's fund and the interest rate for the coming year.

The two-page annual statements sent to Szymanski followed the same format each year. Among the items listed, which included the relatively constant figures showing annual premiums of $413.25 and current sum insured of $25,000, each statement showed the accumulated value and the current cash value of the policy, as well as the projected values for the next policy year based on the declared interest rate. No information was provided as to how these figures affected the 1986 illustrations regarding vanishing premiums, or how the information should be utilized by the policy holder to monitor the progress of his policy toward that goal. Yet every statement, from 1987 to 1995, described the current year's interest rate as "indicative of Boston Mutual's favorable investment experience," despite the steady decline: from the 10.5 percent guaranteed rate in the first year, to 9.0 percent in 1987, dropping again to 8.25 percent in 1989, then dropping to 7.25 percent in 1993, 6.75 percent in 1994, and finally to 6.25 percent in 1995.

Boston Mutual maintains that the information provided in the annual statements contained all that Szymanski needed to know to alert him that his policy would not become self-sustaining as promised. Boston Mutual claims that by comparing the figures in the annual statements to the 1986 illustrations and to the table in his policy showing the guaranteed cash values, Szymanski should have known, by 1992, or at the very latest 1994, that

---

[8]For example, the policy's "Special Premium Pay Option," see note 7, *supra*, provided that the excess cash value, which may be used to pay the annual premium in certain circumstances, is calculated by subtracting the policy's guaranteed cash value (as calculated at the 4.0 percent interest rate) from the policy's cash value (the accumulated value less surrender fee).

his policy had no chance of reaching the necessary accumulated value to cover the annual premium that would become due in 1996.

Apart from the special premium payment option in the policy, however, none of the documents made available to the plaintiff explained to the policy holder how the values in the annual statements could be used to calculate when the policy would become self-sustaining. A jury could find that another vital piece of information was missing from the plaintiff's perspective throughout: the 10.5 percent interest rate was artificially high and would not be duplicated, and the policy therefore had no chance of becoming self-sustaining at the end of nine years as promised. The plaintiff did not possess a sufficient combination of information and understanding to realize the lower rates disclosed by his annual statements would in fact produce a premium obligation over a term much longer than he signed on for.

In the circumstances presented here, we cannot identify, as matter of law, which year's annual statement (if any) should have aroused the plaintiff's suspicions. Moreover, based on the figures available to the plaintiff, and even assuming he understood the significance of the information in the annual statements in comparison to the figures in the policy and the 1986 illustrations, it is by no means clear that, even as of May, 1994, he should have ascertained that his accumulated value would be insufficient to cover the premium for 1996.[9] Compare *In re Northwestern Mut. Life Ins. Co. Sales Practices Litigation*, 70 F. Supp. 2d at 475 & 485 (plaintiff "practically deluged" with over seventy notices and annual statements from insurer that clearly indicated additional premiums would be due, contradicted agent's representations about vanishing premiums, and should have prompted inquiry); *McCord* v. *Minnesota Mut.*

[9]As the plaintiff demonstrates in his reply brief, under the "Special Premium Payment Option" policy provision, which provides for premiums to be paid out with the excess cash value after six years, there is a question whether a reasonable policy holder, even in May, 1995, would read the formula put forth therein to understand that the excess cash value of his policy was not in fact growing sufficiently to cover the premiums in 1995.

*Life Ins. Co.*, 138 F. Supp. 2d 1180, 1188 & n.13 (D. Minn. 2001).[10]

In hindsight and with considerable study, including the benefit of the parties' briefs[11] and the record containing the ten annual statements side-by-side to compare with the 1986 illustrations and the cash values and the guaranteed cash values in the policy, it is still unclear to us at what point the plaintiff should have been on notice that his policy was not accumulating sufficient value to cover the premiums in the tenth year. Boston Mutual suggests that it was a relatively simple matter to ascertain how the vanishing premiums worked and how the downward spiral of the policy's interest rate rendered the promise of vanishing premiums a nullity. Whether the plaintiff should have known that, and when, is quite another matter.[12] We find the reasoning in *Gaidon I* persuasive in this regard: "Consumers vary in their level of sophistication and their ability to perceive the connection between a fluctuation in dividend/interest rates and a vanishing date, or to make the necessary arithmetic adjustments. The issue before us is not whether, as a matter of law, reasonable consumers would be misled in a material way, but whether

---

[10]In *McCord* v. *Minnesota Mut. Life Ins. Co.*, 138 F. Supp. 2d at 1184-1185 nn.5 & 6, the court observed that the plaintiffs were experienced businessmen, one who "owned his own business, bought and sold real property, conducted title searches, executed and carried out business contracts . . . ," another the "president of a company in which he owns an interest, interacts frequently with lawyers and accountants, and has owned life insurance policies . . . ."

[11]For our benefit, Boston Mutual has provided charts, with the requisite figures pulled from various sources and listed side-by-side, to demonstrate the ease with which the plaintiff should have discovered early on that his policy could not possibly be self-sustaining as promised. We note that these charts in no way resemble the cryptic information provided the plaintiff in the annual statements.

[12]Indeed, on this record, the method for calculating the point at which the plaintiff's premiums would vanish remains a mystery. The annual statements, taken alone, provide no guidance as to how to utilize the information provided therein. The 1986 policy compounded the confusion with its "Special Premium Payment Option" formula for computing the excess cash value from the cash value and the guaranteed cash value, and even that formula required cross-references to the policy's definitions section and the table showing guaranteed cash value for each policy year. Yet had the plaintiff attempted to calculate his policy's progress according to that formula, the plaintiff might reasonably have understood that his policy was accumulating sufficient value to cover the premiums as anticipated.

that prospect is enough to create a question of fact . . . ." *Gaidon I*, 94 N.Y. 2d at 345 (holding that plaintiff's opposition to summary judgment motion was sufficient to raise question of fact under New York consumer protection statute prohibiting deceptive insurance practices).

On this record, and taking all reasonable inferences in the plaintiff's favor, we conclude that summary judgment for the defendant, on the basis that a reasonable policy holder in the plaintiff's position should have known or should have inquired, prior to May, 1996, about the policy's diminishing performance and its implications for future premium payments, was not warranted. Against the backdrop of the inflated interest rate in the 1986 illustrations and the false expectations it engendered, there was a jury question as to when the plaintiff should have been alerted by the information available that his policy's accumulated value was unlikely to reach a self-sustaining level after nine years. It is the deceptive quality of the 1986 illustrations and their effect on the way in which a reasonable consumer in the plaintiff's position should have viewed the subsequent information received from the insurer that distinguishes this case from *Patsos* v. *First Albany Corp.*, 433 Mass. at 329 (broker's monthly statements to plaintiff investor contained all the information he needed to discover that funds from his account had been wrongfully withdrawn by First Albany's employees), upon which Boston Mutual relies.

2. *Nondisclosure.* We briefly touch on Szymanski's other arguments for tolling the limitations period pursuant to the discovery rule. Szymanski claims that Boston Mutual fraudulently concealed the plaintiff's cause of action, and also that Boston Mutual had a fiduciary duty to disclose the unrealistic interest rate it used in the 1986 illustrations to Szymanski. See G. L. c. 260, § 12. "[T]he statute of limitations may be tolled under G. L. c. 260, § 12, if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means of acquiring knowledge of such facts." *Frank Cooke, Inc.* v. *Hurwitz*, 10 Mass. App. Ct. at 106. Neither theory has support in the record. .

Fraudulent concealment requires proof that "the defendant

concealed the existence of [the plaintiff's] cause of action through some affirmative act done with intent to deceive." *Frank Cooke, Inc.* v. *Hurwitz*, 10 Mass. App. Ct. at 108. Szymanski attempts to prove fraudulent concealment based on omissions in Boston Mutual's annual statements. Even when fraud is assumed in the initial transaction underlying the suit, mere silence in subsequent dealings between the parties does not amount to fraudulent concealment; there still must be the requisite affirmative act. *Salinsky* v. *Perma-Home Corp.*, 15 Mass. App. Ct. 193, 196-197 & n.5 (1983) (contrasting Massachusetts practice with more liberal Federal rule that when fraud is involved, the action is "automatically concealed"). See *Connelly* v. *Bartlett*, 286 Mass. 311, 317-318 (1934). Boston Mutual's failure to disclose in its annual statements between 1987 and 1995 that the interest rate listed therein would not permit premiums to vanish as originally promised, does not constitute proof of an affirmative act of concealment.[13,14]

Significantly, when the plaintiff did make inquiry in 1996, Boston Mutual provided him with detailed information about the likely future value of his policy and its effect on premiums. Compare *Patsos* v. *First Albany Corp.*, 433 Mass. at 327 & 338.

There is nothing in the record that creates a question of fact regarding the existence of a fiduciary relationship between Szymanski and the insurer that would give rise to a heightened duty of disclosure. The relationship of insurer and policy holder does not entail a fiduciary duty "absent 'special circumstances of assertion, representation and reliance.' " *Baldwin Crane & Equip. Corp.* v. *Riley & Rielly Ins. Agency, Inc.*, 44 Mass. App. Ct. 29,

[13]We also do not view Boston Mutual's use of the word "favorable" to describe its interest rates in its annual statements, albeit misleading in the context of the 1986 illustrations, as rising to the level of an affirmative act of concealment, given the policy's guaranteed interest rate of 4 percent.

[14]We speak only to the issue of fraudulent concealment of the plaintiff's cause of action, and not to the merits of the plaintiff's substantive claims for fraud, deceptive practices, and the like. Those claims involve allegations of misleading, partial disclosures, beginning with the initial sales pitch in 1986, and compounded by nondisclosures in the annual statements sent to the plaintiff in the ensuing years. See, e.g., *Cole* v. *New England Mut. Life Ins. Co.*, 49 Mass. App.Ct. 296, 300 (2000), quoting from *Kannavos* v. *Annino*, 356 Mass. 42, 48 (1969) ("half truths may be as actionable as whole lies").

32 (1997), quoting from *Rapp* v. *Lester L. Burdick, Inc.,* 336 Mass. 438, 442 (1957). Compare *McCue* v. *Prudential Ins. Co. of America,* 371 Mass. 659, 661-662 (1976). That Pittella sought out Szymanski's business does not constitute special circumstances that go beyond the usual acts of solicitation. See, e.g., *Rapp* v. *Lester L. Burdick, Inc., supra.* Nor does Szymanski's averment that he told Pittella he was relying on his advice, without more, create a jury question as to the nature of the relationship. See *Pastos* v. *First Albany Corp.,* 433 Mass. at 335-336, citing *Snow* v. *Merchants Natl. Bank,* 309 Mass. 354, 360-361 (1941).[15]

B. *Failure to state a claim.* Boston Mutual urges us to consider, as an alternative ground for entering summary judgment in its favor, its argument that Szymanski's several counts in his complaint failed to state a claim upon which relief could be granted. The judge did not reach the issue, having allowed Boston Mutual's motion for summary judgment on the basis of its statute of limitations defense. We decline to do so here. The parties' arguments before the trial judge in connection with the defendant's alternative ground for dismissal do not appear in the record. More important, given the parties' emphasis on the statute of limitations issue in their briefs on appeal and at oral argument, it is preferable that the parties address the defendant's alternative ground for dismissal on remand. See *Middleborough* v. *Middleborough Gas & Elec. Dept.,* 422 Mass. 583, 588 (1996).

In a similar vein, we do not discuss Szymanski's argument, raised for the first time on appeal, that he suffered no injury until he received the first bill for out-of-pocket premiums beyond the year in which he had been told his policy would be self-sustaining, such that his cause of action did not accrue until 1996. This reasoning has been followed by several courts, and

---

[15]The plaintiff additionally argues that a duty to disclose may arise in circumstances other than that of a fiduciary relationship, such as pursuant to the implied covenant of good faith and fair dealing. For purposes of tolling the statute of limitations, however, our cases thus far speak only to the failure to disclose pursuant to a fiduciary duty of full disclosure as the equivalent of fraudulent concealment. See, e.g, *Puritan Med. Center, Inc.* v. *Cashman,* 413 Mass. 167, 175-176 (1992); *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 519 (1997). We see no reason to extend the doctrine.

recently in *Gaidon* v. *Guardian Life Ins. Co. of America,* 96 N.Y.2d 201, 211-212 (2001). See *Underwood* v. *Life Ins. Co. of Georgia,* 14 F. Supp. 2d 1266, 1273 (N.D. Ala. 1998) (plaintiff's action for fraud based on vanishing premiums policy deemed premature since it was filed before additional premiums were charged); *Stringfellow* v. *State Farm Life Ins. Co.,* 743 So. 2d 439, 441 (Ala. 1999) (plaintiff had no justifiable controversy until he was billed for additional payments beyond date when he had been told policy would be self-sustaining). As discussed in note 3, *supra,* the rules for the accrual of causes of action in Massachusetts differ from some other jurisdictions, notably New York. On balance, the pertinent inquiry here with regard to accrual is not when the plaintiff first had to pay unanticipated premiums or what death benefit his policy would have paid had he died before 1996, but rather, when the plaintiff was on notice that he had purchased a policy that was to cost him far more than originally represented.

*Conclusion.* Based on the foregoing, the judgment is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*