AMERICAN FIBER & FINISHING, INC., Trustee of American Fiber & Finishing, Inc. Realty Trust, Plaintiff,

v.

TYCO HEALTHCARE GROUP, LP, Defendant.

No. CIV. A. 01–10294–GAO.

United States District Court, D. Massachusetts.

July 28, 2003.

**156**

Joseph L. Bierwirth, Hemenway & Barnes, Boston, MA, for American Fiber & Finishing, Inc., Plaintiff.

Ben T. Clements, Sullivan Weinstein & McQuay, P.C, Boston, MA, for Tyco Healthcare Group, LP, Defendant.

John M. Griffin, Tyco Healthcare Group, LP, Mansfield, MA, for Tyco Healthcare Group, LP, Defendant.

Diane C. Tillotson, Hemenway & Barnes, Boston, MA, for American Fiber & Finishing, Inc., Plaintiff.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff, American Fiber & Finishing, Inc., Trustee of American Fiber & Finishing, Inc. Realty Trust ("AF & F"), claims that the defendant, Tyco Healthcare Group, LP ("Tyco") is liable, as a successor-in-interest to the Kendall Company ("Kendall"), for costs and damages in connection with the decontamination of property in Colrain, Massachusetts, that AF & F acquired from Kendall in 1986. AF & F presents claims arising under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E, § 5 (Counts I and II); the warranty and contractual indemnification clauses of the Asset Purchase Agreement between AF & F and Kendall (Counts III and IV); the common law of misrepresentation (Count VI); and the Massachusetts Consumer Protection Act, Mass. Gen. Laws. ch. 93A, §§ 2 and 11 (Count VII). A claim under the common law for indemnification (Count V) was abandoned.

Tyco has moved for summary judgment, arguing that AF & F's claims are either time-barred or necessarily fail on the merits. The defendant's motion is GRANTED for the reasons that follow.

## I. Undisputed Facts

On March 20, 1986, AF & F purchased from Kendall an industrial site, including both land and buildings, located in Colrain, Massachusetts ("the Site" or "the Colrain property"), pursuant to an Asset Purchase Agreement ("Agreement"). Kendall had owned the Site from 1932 to 1986 and engaged in the manufacture of cotton products there. At the time of AF & F's acquisition of the Site, there were three 25,000–gallon underground storage tanks used to store No. 6 fuel oil. There had been a release of about 2,000 gallons of oil

from an underground tank in November 1983, and there is evidence that there had been other releases of a significantly greater amount of oil sometime in the 1970s.

Kendall reported the 1983 release to the Massachusetts Department of Environmental Quality Engineering ("DEQE").[1] In December 1983, Kendall decommissioned the three underground tanks. Based on the information that Kendall had provided to it (some of which AF & F claims was false), the DEQE did not require Kendall to remove the tanks, but instead permitted them to remain in place, although their use was discontinued. From late 1983 on, oil continually seeped from the ground into the wheel pit area, and a dam of absorbent booms and pads was employed to soak up the seeping oil.

At the time of the acquisition of the Site, AF & F's principals, J.J. Kiser and Edward C. Shotwell, had worked for Kendall for more than 20 years, and each possessed extensive knowledge of Kendall's business conducted at the Site. Another employee of AF & F, Robert A. Young, had worked for Kendall since 1980 and had served as Kendall's plant manager at the Site.

Before the acquisition, AF & F hired Goldberg–Zoino & Associates ("GZA") to perform an environmental assessment of the Site. In addition to interviewing Kendall employees and reviewing DEQE files, GZA conducted some soil sample analyses, although it did not take any borings or analyze any soil samples in the vicinity of the underground oil storage tanks. GZA had been informed of the 1983 release of oil, as well as a much smaller (about 40 gallons) surface spill in 1985. GZA was not informed that there had been significant releases in the 1970s.

In 1997, AF & F decided to sell the Colrain property. In connection with this effort, AF & F sought engineering services from William Volk, a former Kendall employee who had served as AF & F's Engineering Manager in 1986 and later formed his own engineering firm. In his proposal, Volk listed several "environmental issues" that AF & F needed to address, including the need to reach a "[l]ong-term solution to the early '80s underground # 6 oil spill" at the Site. Clements Aff., Ex. I(3), § 7 at 2. AF & F then retained GZA to perform an updated environmental assessment. GZA's report, dated June 4, 1997, concluded that the evidence at the Site showed oil was present in the soil or groundwater in the wheel-pit area and in the vicinity of the three abandoned underground oil storage tanks. *Id.* Ex. L, § 9.20, at 27.

The Department of Environmental Protection ("DEP") (successor to the DEQE) inspected the Site in July 1997. The DEP found oil in the wheel-pit area, and on August 25, 1997, issued a Notice of Responsibility to AF & F, requiring the company to "conduct a subsurface investigation, including installation of soil borings and monitoring wells . . . ." *Id.* Ex. H(7), at 2.

In response, AF & F retained East Coast Engineering ("ECE") to determine the depth of contaminated soil in the vicinity of the underground tanks and whether the presence of oil in the wheel pit was related to the release from these tanks. Among other things, ECE reported that soil borings near the underground tanks indicated the presence of No. 6 oil at the depth of about 14 feet and proposed removing the contaminated soil from under the storage tanks. *Id.* Ex. M, ECE Re-

---

1.  DEQE was the predecessor agency to the current Department of Environmental Protec-  tion ("DEP").

port, October 15, 1997, § 4.0, at 8, 9. In April 1999, AF & F first gave Tyco notice that it had received, about a year and a half earlier, a Notice of Responsibility from the DEP regarding the Site. *Id.* Ex. J, Pl.'s Answers to Tyco, Interrog. # 16, at 15–16; *see also* Statement of Undisputed Facts Supp. Def.'s Summ. J. Mot., ¶ 88 at 18. In July 1999, AF & F began excavation to remove the three underground storage tanks and learned that the soil contamination was far more extensive than "anticipated." Clements Aff., Ex. N, Cummings Report, October 1, 2002, at 4.

As a result of the contamination at the Site, AF & F incurred cleanup costs and expended substantial sums for site investigation, including soil borings, the installation of monitoring wells, water and sediment sampling and analysis, engineering drawings, legal fees, and the preparation of various reports.

AF & F commenced this action against Tyco, as a successor to Kendall, on February 16, 2001.

## II. Applicable Law and Legal Analysis

### A. Statutes of Limitations

Tyco asserts that four of AF & F's six claims (Counts II, III, VI, and VII) are barred by the applicable statutes of limitations. A three-year limitations period applies to Count II (property damage under Mass. Gen. Laws ch. 21E, § 5), *see* Mass. Gen. Laws ch. 21E, § 11A(4), and also Count VI (common law misrepresentation), *see* Mass. Gen. Laws ch. 260, § 2A. The Chapter 93A claim in Count VII has a four-year limitations period, *see* Mass. Gen. Laws ch. 260, § 5A, and the claim for breach of warranty set forth in Count III is governed by a six-year limitations period, *see* Mass. Gen. Laws ch. 260, § 2.

This action was commenced February 16, 2001. All four of the causes of action referred to in the previous paragraph are based on events preceding or coinciding with the execution of the Asset Purchase Agreement in 1986. For example, any misrepresentation or deception about the condition of the property that induced the purchase must have occurred prior to the signing of the agreement. The warranty at issue in Count III (if it exists) is set forth in the agreement, and its breach allegedly occurred immediately as, according to AF & F, it was false when made. *See* Compl. ¶ 42. The defendant's liability under chapter 21E as an owner of the property necessarily arises from the period of its ownership, which ended with the sale in 1986.

Thus, *unless* the accrual of any of these causes of action was deferred for some reason, the complaint was filed well outside the limitations periods applicable to them. AF & F suggests two reasons why the accrual of the claims should be deemed delayed. First, it invokes the "discovery rule," which holds that a cause of action does not accrue until the plaintiff knows or, in the exercise of diligence, ought to know of facts giving rise to the claim. *See Patsos v. First Albany Corp.*, 433 Mass. 323, 741 N.E.2d 841, 846 (2001) (summarizing rule). This rule applies to the statutory claims as well as the common law claims. *See Szymanski v. Boston Mut. Life Ins. Co.*, 56 Mass.App.Ct. 367, 778 N.E.2d 16, 20 (2002).

The discovery rule can toll the limitations period applicable to actions under chapter 21E. In such cases, the Supreme Judicial Court ("SJC") has said that the limitations period begins to run "when a plaintiff discovers or reasonably should have discovered (1) the damage and (2) the cause of the damage, *i.e.*, the person liable under [Mass. Gen. Laws ch.] 21E for the release or threat of release of hazardous material." *Taygeta Corp. v. Varian Assocs., Inc.*, 436 Mass. 217, 763 N.E.2d 1053, 1061 (2002).

■ However, "[t]he plaintiff need not know the full extent of its injury for a cause of action to accrue and for the statute of limitations to begin running." *Taygeta Corp.*, 763 N.E.2d at 1063. *See also Beaconsfield Townhouse Condo. Trust v. Zussman*, 49 Mass.App.Ct. 757, 733 N.E.2d 141, 146 (2000); *Olsen v. Bell Tel. Labs., Inc.*, 388 Mass. 171, 445 N.E.2d 609, 612 (1983). Rather, a party is considered to have "discovered" the cause of action when it has learned of the fact of injury or damage.

It is of no consequence that AF & F did not know the exact source of the contamination when it purchased the property. *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir.1983). Once a party has notice of an injury or harm, "his cause of action is no longer inherently unknowable," and he is obliged to investigate with due diligence to discover from scientific and legal sources "whether the theory of causation is supportable and whether it supports a legal claim." *Id.* at 199.

■ *Tagliente v. Himmer*, 949 F.2d 1, 5 (1st Cir.1991), illustrates the application of this principle. In *Tagliente*, the plaintiff purchased real property in 1986, but waited until 1988 to investigate and learn that much of it consisted of wetlands and was, consequently, unbuildable. He waited another two years before suing the seller for fraudulent misrepresentation. The court refused to toll the three-year limitations period for actions in tort because Tagliente "had the unrestricted opportunity to inspect the land, conduct surveys, secure topographical studies, and study the regulations governing use and conservation in [the municipality]." *Id.* at 5. It is the plaintiff's burden to show that it could not, even through the exercise of reasonable diligence, have learned of the existence of a cause of action against the defendant. *Id.*

■ There is no dispute that, prior to purchasing the Site in 1986, AF & F knew that the Site had experienced some level of contamination from oil releases. Specifically, AF & F was aware that the property contained three 25,000–gallon underground storage tanks, that there had been a substantial release from the tanks in 1983, and that oil continued, even as of the closing date in 1986, to leak or seep into the wheel pit area, requiring ongoing remediation in the form of oil absorbent booms and pads. It is also undisputed that key employees of AF & F had, in their previous capacities as Kendall employees, long-standing familiarity with the Site, at least in general terms. Therefore, it is clear that AF & F had *some* knowledge of the existence of oil contamination in 1986, nearly fifteen years before this suit was filed.

Not only did AF & F have knowledge of the contamination problem, it also took steps to investigate the extent of the contamination. GZA was hired to perform an environmental site assessment precisely because AF & F *did* know about the actuality of some level of contamination at the Site and the possibility that the contamination was greater than was known (or "anticipated"). The thoroughness of the GZA investigation and the information it yielded are beside the point. Even under the "discovery rule" the limitations period commenced running when AF & F had both knowledge that there was some level of contamination from the oil storage tanks and an "unrestricted opportunity" to investigate the source and extent of the contamination. *See id.*

■ The other tolling theory advanced by AF & F is that Kendall fraudulently concealed from AF & F facts that would have revealed the existence of the cause of action. As with the discovery rule, however, application of this theory is thwarted by the fact that AF & F knew there was a

problem and had the opportunity to conduct whatever investigation it wanted. There is no evidence offered of active concealment by Kendall (or Tyco) of facts relating to the condition of the Site. *See Sarocco v. Gen. Elec. Co.,* 939 F.Supp. 91, 97 (D.Mass.1996). To the contrary, AF & F was free to do virtually whatever investigation it wanted. That GZA apparently did only a limited investigation is not attributable to any affirmative acts of concealment on Kendall's part.

For the four claims that arise out of the negotiation and consummation of the Asset Purchase Agreement, the relevant limitations periods were not tolled and they have all long since expired. The defendant is entitled to judgment in its favor *dismissing* these claims.

B. *The Indemnification Claim*

In Count IV, AF & F claims that Tyco is liable under § 14.2 of the parties' Asset Purchase Agreement ("Agreement"), which provides as follows:

> 14.2 Seller's Indemnity. Seller hereby indemnifies and holds Buyer harmless from and against any and all losses, claims, demands, costs and expenses (including reasonable attorneys' fees and expenses) of every kind, nature or description incurred or occurring after the Closing Date and arising out of or relating to any of the following:
>
> > (a) any liabilities or obligations, unknown, other than the Assumed Liabilities, arising solely out of the operations of the Businesses existed [sic] prior to the Closing;
> >
> > (b) any representation or warranty of Seller contained herein being materially false or inaccurate as of the date such representation or warranty was made, subject to the time limitation in Section 12;
> >
> > . . . .

Buyer shall promptly notify Seller of the assertion of any claim or discovery of any fact upon which Buyer intends to base a claim for indemnification hereunder.

Because this provision is ambiguous as to whether AF & F is indemnified for environmental damage which occurred prior to the sale, resolving that question would require a factual inquiry into what the parties intended the scope of the indemnification to be. *Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc.,* 416 Mass. 684, 624 N.E.2d 959, 966 (1993) (stating that under Massachusetts law, "the interpretation of [an] indemnification clause turns on the expectations and intentions of the parties, at the time of agreement") (internal quotations omitted). But even if the parties intended the contract clause to indemnify AF & F for pre-existing environmental problems at the Site, the plaintiff's claim is barred because AF & F did not "promptly notify" Tyco (as Kendall's successor) of the claim and thus may not invoke the indemnity clause.

Where the clause at issue is the product of bargaining between sophisticated parties, it will be enforced according to customary rules of contract interpretation. *Cheschi v. Boston Edison Co.,* 39 Mass. App.Ct. 133, 654 N.E.2d 48, 53–54 (1995); *Kelly v. Dimeo, Inc.,* 31 Mass.App.Ct. 626, 581 N.E.2d 1316, 1318 (1991). So, where the parties agree to require "prompt notice," that requirement will be enforced. *Cheschi,* 654 N.E.2d at 54.

Under Massachusetts law, where the facts concerning when notice was given are undisputed, whether the notice was "prompt" within the meaning of a contract provision is a matter of contract interpretation and thus a question of law, suitable for resolution on summary judgment. *Royal–Globe Ins. Co. v. Craven,* 411 Mass. 629, 585 N.E.2d 315, 317 (1992). In *Cra-*

*ven,* the SJC ruled, as a matter of law, that notice given four months after was not "prompt," relying on a common dictionary definition of the word. *Id.* at 317.

■ AF & F seeks to invoke the indemnification clause to recover its costs incurred in undertaking site remediation that was occasioned by the DEP's Notice of Responsibility. That Notice was served on AF & F in August 1997. At that point, AF & F had known for more than ten years of the existence of a contamination problem of some dimension. AF & F also knew that it would incur costs and expenses as a result of the DEP's Notice. It further knew that it had the benefit of the indemnification clause and that these costs could, arguably at least, be recoverable under that clause. Knowing these things, AF & F nevertheless waited until April 1999 to give notice to Tyco. By any reasonable definition, such notice was not "prompt."

The notice provision in the indemnification clause was part of the mutual exchange of promises by AF & F and Kendall and thus a material part of their contract. Accordingly, AF & F's failure to perform its obligation to give notice excuses Kendall/Tyco from performance of its obligations under the indemnification clause. *See Massachusetts Port Auth. v. Johnson Controls, Inc.,* 54 Mass. App.Ct. 541, 766 N.E.2d 542, 544–45 (2002). Tyco is not required to show that it was prejudiced by the delay in notice. *See id.* at 546 n. 3; *Cheschi,* 654 N.E.2d at 53–54.

Tyco is entitled to judgment in its favor under Count IV.

### C. *Liability for Causing Release of Oil*

■ In Count I, the plaintiff claims damages under Mass. Gen. Laws ch. 21E, § 5(a)(5), which provides in relevant part that:

Any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault . . . to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release . . . .

Mass. Gen. Laws ch. 21 E, § 5(a)(5). It is the plaintiff's burden to show that the defendant actually "caused" the harm complained of. *Griffith v. New Eng. Tel. and Tel. Co. (Griffith II),* 420 Mass.365, 649 N.E.2d 766, 769 (1995); *Marenghi v. Mobil Oil Corp.,* 416 Mass. 643, 624 N.E.2d 561, 563 (1993). This language has not been fully explicated by the courts of the Commonwealth, but it does seem to be the case that to establish causation under § 5(a)(5), "there must be more than a showing that the defendant previously owned the site, brought oil onto the property, or stored oil on the property." *Griffith II,* 649 N.E.2d at 769. Thus, it is not enough to demonstrate that contamination came from the underground tanks while Kendall owned the property; the plaintiff must provide evidence of how and when the contamination happened. *See id.* In other words, liability is not based on the defendant's *status* as the owner and custodian of the Site. Rather, the plaintiff must present evidence that defendant somehow caused the release—that is, that the release occurred as the result of something the defendant did or omitted to do.

At this late stage of the case, after discovery and just before trial, the plaintiff has not offered evidence to explain how something Kendall did or did not do caused the release of oil. The condition of the evidence available for trial is such that any conclusion on this issue would inevitably rest on guesswork or surmise, rather than justifiable inference. That is insufficient, and the defendant is, in such circum-

stance, entitled to judgment in its favor on this claim.

## III. Summary/Conclusion

On the facts of this case, the statute of limitations issue is not a close call. Any reasonable factfinder would have to conclude that AF & F knew about the continuing oil seepage and contamination at the Site as of its acquisition of the Site in 1986. The running of the applicable limitations periods was not tolled, and the claims in Counts II, III, VI and VII are barred. The claim in Count IV for contractual indemnification fails for late notice. The claim in Count I for contribution under Mass. Gen. Laws ch. 21E, § 5(a)(5), cannot succeed where plaintiff cannot demonstrate that the defendant caused the oil release that necessitates the remediation.

For all these reasons, the defendant's motion for summary judgment is GRANTED. Judgment shall enter in favor of the defendant on all counts of the complaint.

It is SO ORDERED.