The plaintiff, Douglas M. Kelly, claims that the defendants, Waters Corporation (Waters) and its predecessor in interest, NuGenesis Technologies Corporation (NuGenesis), owe him millions of dollars in compensation for computer software he developed and sold to NuGenesis in 1999. After a lengthy period of unsuccessful negotiations, Kelly brought this action in the Superior Court alleging, among other things, fraud and violations of G. L. c. 93A. The defendants filed a motion to dismiss the complaint under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). The motion was allowed by a judge of the Superior Court on various grounds, and judgment entered accordingly. This appeal ensued.
1. Background. We summarize the facts as alleged in Kelly's complaint and in the documents attached and incorporated in the complaint. See Harhen v. Brown, 431 Mass. 838, 839-840 (2000). Between 1987 and 1999, Kelly developed two software products entitled Archive and VP Office. Both programs were designed to assist pharmaceutical companies and other related industries regulated by the Food and Drug Administration to comply with reporting and record-keeping obligations. NuGenesis was founded in 1997 and was still a start-up company with one viable product, known as Unify & Vision (UV), which was substantially similar to VP Office, when NuGenesis executives approached Kelly about developing and selling Archive and VP Office. Ultimately, on February 23, 1999, NuGenesis and Kelly entered into an asset purchase agreement (agreement) by which NuGenesis purchased all rights, title, and interest to both Archive and VP Office. Under the terms of the agreement, Kelly was to receive a percentage of future sales and royalty payments. The agreement also contained a forum selection provision specifying, as relevant here, that any action to enforce the rights of a party under the agreement would be commenced in the United States District Court for the District of Massachusetts.
In 2001, Kelly asserts, NuGenesis executives persuaded him to amend the agreement by implying that NuGenesis would develop its own version of Archive unless Kelly cooperated and agreed to amend the agreement. He was informed that Archive sales were low and that most of the revenue came from the sale of UV and not Archive. The agreement, as amended, further reduced Kelly's royalty payments.
In 2003, NuGenesis and Waters announced that Waters was in the process of acquiring NuGenesis. Shortly thereafter, Kelly began to receive information from certain NuGenesis employees about malfeasance in connection with the allocation of sales and royalty payments under the agreement. On February 17, 2004, Kelly sent a detailed letter to counsel for NuGenesis, in which he raised numerous concerns and alleged that the defendants had deceived and underpaid him. More specifically, Kelly asserted as follows:
"[I]nformation has come to my attention that a large number of 'techniques' were gradually concocted by senior management to substantially reduce the amounts payable under [the agreement]. The amount of damages is yet to be determined but it would be in the low seven-figure range, plus interest.
"So far, I have been told -- in outline form -- of four or five methods which were employed to reduce the amounts paid under the [agreement]. One person told me 'and Doug -- you don't know the half of it.' Yet!"
Kelly further stated:
"Vital information necessary to accurately evaluate the state of the company, in particular the s[t]ate of its relations with the pharmaceutical companies, its sales organization, the turmoil in the sales organization, and the counterproductive sales methods being employed was completely withheld from me or the opposite of the truth was presented as the factual. I now have many examples of both.
"By 2001, most major pharmaceutical companies had looked at NuGenesis and most of them liked -- even loved -- the products. The few who did not saw great potential in the products if additional engineering work was done -- and it was. That is not an uncommon assessment with software products. But also, by late 2001 nearly all of those large firms and many, many smaller ones as well, wanted as little to do with the NuGenesis sales organization or the senior executives of NuGenesis as possible. All of this was hidden from me during my due diligence. In fact, people who knew some or all of these facts had been explicitly, directly and repeatedly told -- by senior management NOT to tell me what they knew or even communicate with me on any issue."
Kelly also claimed that three people were prepared to sign sworn affidavits and that he had the names of seven additional individuals who had relevant information. Kelly said he would contact those people and others "if need be."
In response to Kelly's letter, counsel assured Kelly that Waters intended to honor the agreement. However, between April 2004 and January 2005, Kelly did not receive any sales reports or royalties. Kelly contacted Judy Jackman in the Waters accounting department, who told Kelly that the delay was caused by Waters's acquisition of NuGenesis. In early 2005, Kelly was provided with the late royalty payments. The sales of Archive were still lower than what Kelly had expected. Kelly asked for an explanation but did not receive one.
Over the following two years, Kelly continued to question whether Waters was underreporting sales and whether he was receiving the royalties to which he was entitled under the agreement. In 2006, Waters conducted an internal audit, which revealed that NuGenesis had used certain tactics to boost sales of its UV product to Kelly's detriment. The audit also disclosed that Waters would have to change certain practices to fully comply with the agreement. However, nothing changed, and the dispute between Kelly and Waters continued. Eventually, in October of 2008, the parties executed an agreement tolling the statute of limitations relating to Kelly's claims (tolling agreement). Soon after the tolling agreement was signed, Waters provided Kelly with 4,000 pages of sales records covering the period from 1999 to 2004. According to Kelly, these records demonstrate that NuGenesis fabricated UV sales and gave away free or unlicensed copies of Archive. NuGenesis fraudulently recorded its customers as having paid for purchases of UV that the customers did not want or need. NuGenesis also sold copies of Archive to numerous customers, but falsely designated those as sales of UV. In addition, NuGenesis inflated UV's sales to fabricate demand for UV and deprive Kelly of sales royalties from Archive. And, NuGenesis failed to develop or sell VP Office.
Kelly asserts that Waters continued these same sales and reporting practices after it acquired NuGenesis. Ultimately, on September 23, 2016, Kelly sent Waters a lengthy demand letter, which included an offer to settle the claims. The demands were not met, and the offer to settle was declined. Kelly then brought this action in the Superior Court alleging fraud, breach of contract, and violations of c. 93A. Kelly also sought a full accounting and requested that the court ignore NuGenesis's corporate form, i.e., that it pierce the corporate veil.
As previously noted, Waters filed a motion to dismiss the complaint. Waters asserted that the fraud and c. 93A claims were barred by the applicable statutes of limitations and the remaining claims should be dismissed pursuant to the forum selection provision in the agreement.
In a well-reasoned memorandum and order, the Superior Court judge observed that the complaint alleged fraud and c. 93A violations in two different time periods. First, Kelly claimed that NuGenesis fraudulently induced him to sell Archive and VP Office in 1999, and then fraudulently induced him to amend the agreement in 2001. Second, Kelly claimed that the fraud continued after the 2001 amendment to the agreement was executed. The judge analyzed the two periods of fraud and corresponding c. 93A claims separately. With respect to the first period of fraud, namely, Kelly's claim that he was fraudulently induced to sell Archive and VP Office to NuGenesis in 1999 and amend the agreement in 2001, the judge concluded that the applicable statutes of limitations barred the claims. As the judge explained, fraud claims have a three-year statute of limitations, G. L. c. 260, § 2A, and claims under c. 93A have a four-year statute of limitations, G. L. c. 260, § 5A. The judge acknowledged that in Massachusetts, a discovery rule operates to toll a limitations period until a prospective plaintiff learns or should have learned that he has been injured. Under the discovery rule, the limitation period accrues when the plaintiff has "sufficient notice of two related facts: (1) that he was harmed; and (2) that [the] harm was caused by the defendant's conduct." Harrington v. Costello, 467 Mass. 720, 725 (2014). A plaintiff may be put on "inquiry notice" where he is informed of facts that would suggest to a reasonably prudent person in the same position that an injury has been suffered as a result of the defendant's conduct. Szymanski v. Boston Mut. Life Ins. Co., 56 Mass. App. Ct. 367, 371 (2002). The judge determined that Kelly had inquiry notice that he had been harmed by the defendants' conduct by February 17, 2004. The judge wrote:
"The February 17, 2004 letter unquestionably shows that Kelly was on inquiry notice of a fraud by NuGenesis. Kelly knew that he was harmed and knew that NuGenesis's conduct caused this harm. By that date, Kelly knew that the harm stemmed from the Agreement and the 2001 Amendment."
Consequently, the judge concluded, Kelly was required to file his claim for fraudulent inducement against NuGenesis within three years of February 17, 2004, or by February 17, 2007, and the c. 93A claim was required to be filed within four years of February 17, 2004, or by February 17, 2008. Because the claims were not filed by those dates, the judge dismissed them as time barred.[3]
The remaining counts and so much of the fraud and c. 93A claims that were based on allegations of continuing misrepresentations and deceit were dismissed on the ground that the forum selection provision of the agreement mandated resolution in Federal court. On appeal, Kelly challenges only that portion of the judgment that dismissed the fraud and c. 93A claims as time barred.
2. Discussion. "We review the allowance of a motion to dismiss de novo," accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011). A motion to dismiss shall be granted if the plaintiff's claims do not "raise a right to relief above the speculative level." Iannachino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).
Kelly argues that dismissal is not warranted for three reasons. First, he claims that the defendants owed him a fiduciary duty and, therefore, the statute of limitations did not begin to run until October of 2008, when he received the sales reports from Waters and had actual knowledge of the harm caused by the defendants' conduct. See Passatempo v. McMenimen, 461 Mass. 279, 295 (2012) ("where a fiduciary relationship exists, G. L. c. 260, § 12, tolls the applicable statute of limitations until the plaintiff has actual knowledge of either the harm or the fiduciary's implicit or explicit repudiation of his or her obligations"). We need not address this argument because, as Kelly conceded at oral argument, he specifically withdrew this claim at the hearing on the defendants' motion to dismiss.
Second, Kelly argues that even if his causes of action accrued when he "knew or should have known" that he suffered harm, as opposed to when he "actually knew," he did not have sufficient information to be on "inquiry notice" that the defendants' conduct caused him injury until 2008. We disagree.
"Notice here refers not to discovery of every fact necessary to prevail on the claim, but rather to discovery of the plaintiff's injury as causally connected to the defendant's negligence." International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 218 (1990). The plaintiff may be put on inquiry notice when he is informed of the facts that suggest he has been injured. Pagliuca v. Boston, 35 Mass. App. Ct. 820, 824 (1994), citing Felton v. Labor Relations Comm'n, 33 Mass. App. Ct. 926, 927-928 (1992). Notice is predicated on the view of a reasonably prudent person in the plaintiff's position. See generally Bowen v. Eli Lilly & Co., 408 Mass. 204, 210-211 (1990).
We conclude, as did the judge, that Kelly's letter of February 17, 2004, demonstrates that Kelly had notice of his injury by that time. As we have noted, Kelly stated there that "a great deal of new information has come to my attention -- from a wide variety of sources -- over the past four to five weeks." The information included that NuGenesis had employed a large number of techniques to reduce the amounts to be paid to Kelly under the agreement. Moreover, Kelly alleged that NuGenesis was aware that pharma-centered companies wanted "little to do with the NuGenesis sales organization" and that this was "hidden from me during my due diligence." The letter included a calculation of damages that Kelly alleged he had suffered as a result of conduct by NuGenesis. The letter invited NuGenesis to enter into negotiations to resolve Kelly's claims as to "all issues past, present and future." Given these circumstances, we are confident that a reasonably prudent person in Kelly's position would have known that he had been injured and that the defendants had caused the harm.
Finally, Kelly argues that the statutes of limitations should be tolled because the defendants concealed their wrongdoing and then made representations they knew or should have known would induce him to put off bringing suit. This argument is equally unavailing. Under the doctrine of fraudulent concealment, the statute of limitations is tolled if the alleged wrongdoer took affirmative steps to conceal the existence of a cause of action with the intent to deceive. See Stolzoff v. Waste Sys. Int'l, Inc., 58 Mass. App. Ct. 747, 756-757 (2003). The limitations period is not tolled, however, if the injured party had either actual knowledge of or the "full means of detecting the fraud." Id. at 757, quoting Lynch v. Signal Fin. Co., 367 Mass. 503, 508 (1975). Even if we were to assume that Kelly did not have actual knowledge of fraud, he certainly had the means of detecting it. Accordingly, the discovery rule does not operate to toll the statute of limitations beyond February 17, 2007, with regard to the claims of fraudulent inducement, or beyond February 17, 2008, with regard to the alleged c. 93A violations.
Judgment affirmed.

The tolling agreement, which was signed on October 31, 2008, eight months after the statute of limitations expired, has no effect on the analysis.