Sheila S.[1] *vs.* Commonwealth & others.[2]

No. 01-P-263.

Suffolk. October 16, 2002. - February 24, 2003.

Present: Cypher, Smith, & Grasso, JJ.

*Department of Social Services. Commonwealth,* Claim against. *Limitations, Statute of. Practice, Civil,* Statute of limitations. *Evidence,* State of mind. *Civil Rights,* Immunity of public official.

In a civil action charging the defendant Commonwealth, acting through the Department of Social Services (DSS), with negligence, negligent infliction of emotional distress, and breach of fiduciary duty as a result of its failure to protect the plaintiff from sexual abuse by her uncle when it placed the plaintiff as a teenager in the custody of her uncle and later allowed her uncle unsupervised visitation with the plaintiff, the applicable statute of limitations, G. L. c. 258, § 4, barred the plaintiff's claims against the Commonwealth, where the plaintiff's claims against the Commonwealth were capable of being discovered through ordinary diligence and were not inherently unknowable, as a matter of law, and where the plaintiff's knowledge of DSS's involvement in her placement at the time she realized that she had suffered harm at the hands of her uncle was sufficient, at a minimum, to stimulate further inquiry concerning the Commonwealth's potential liability. [426-429]

At a civil trial, the judge properly excluded evidence relating to the plaintiff's "state of mind," either because such evidence was not relevant or because the exclusion of such expert opinion evidence did not constitute an abuse of the judge's discretion; moreover, even assuming that the evidence should have been admitted, the exclusion of such evidence did not prejudice the plaintiff, who was permitted to introduce other evidence that made the same points. [429-430]

In a civil action charging two agents of the Department of Social Services with violation of the plaintiff's constitutional rights in violation of 42 U.S.C. § 1983, the agents were shielded from liability by the doctrine of qualified immunity where, at the time the agents were responsible for placing the plaintiff in the custody of, and allowing unsupervised visitation with, an uncle who sexually abused her, they did not violate any clearly established rights of the plaintiff, and where, even if a clearly established right existed, there was no evidence that the agents had intentionally violated her rights or were deliberately indifferent to her welfare. [430-432]

[1]A pseudonym.

[2]Laurie (Kalis) Lapidus and Cindy Bregor, in their individual capacities.

CIVIL ACTION commenced in the Superior Court Department on November 16, 1995.

A motion for partial summary judgment was heard by *Peter M. Lauriat*, J., and the case was tried before *Nonnie S. Burnes*, J.

*Edward M. Van Dorn, Jr.*, of New Hampshire, for the plaintiff.

*Michelle A. Kaczynski*, Assistant Attorney General, for the defendants.

CYPHER, J. In 1982, the Department of Social Services (DSS) placed the plaintiff, then fourteen years old, in the custody of her uncle, Thomas Hynes (Thomas) for several days. During and after this short placement, Thomas sexually abused the plaintiff.[3] On November 16, 1995, the plaintiff filed a complaint in Superior Court alleging claims of negligence, negligent infliction of emotional distress, and breach of fiduciary duty against the Commonwealth, acting through DSS, for placing her with Thomas and for failing to ensure that his visits with her be supervised. She also alleged under 42 U.S.C. § 1983 that DSS social workers Cindy Bregor and Laurie Lapidus violated her constitutional rights.[4] Summary judgment was granted in favor of Bregor and Lapidus and a trial was held to determine whether the statute of limitations barred the plaintiff's claims against the Commonwealth. The plaintiff appeals the allowance of a motion for judgment notwithstanding the verdict, certain evidentiary rulings, and the allowance of the motion for summary judgment in favor of the individual social workers. We affirm.

1. *Background.* We summarize the facts in the light most favorable to the plaintiff. On November 16, 1982, the District Court placed the plaintiff in the temporary legal custody of DSS.[5] The plaintiff told DSS worker Bregor that she wanted to live with a family member and did not wish to be placed in foster care or to be returned to her mother. Thomas asked Bregor

---

[3] See *Commonwealth* v. *Hynes*, 40 Mass. App. Ct. 927 (1996).

[4] State law claims against Bregor and Lapidus were dismissed and are not a subject of this appeal. Because the plaintiff has advanced no appellate argument regarding her claim under 42 U.S.C. § 1983 against the Commonwealth, we also do not address that claim.

[5] The plaintiff was the subject of a CHINS petition (child in need of services). See generally *Matter of Gail*, 417 Mass. 321, 324-325 (1994).

if the plaintiff could live with him. He lied to DSS, claiming that he lived with his wife, Elena, and their child, and that he was self-employed. DSS temporarily placed the plaintiff with Thomas.[6]

In fact, Elena had left Thomas four months earlier and had obtained a restraining order against him, and Thomas was unemployed. On November 17 or 18, 1982, the plaintiff's maternal aunt offered to care for the plaintiff. It appears that DSS did not follow up on this offer or communicate it to the plaintiff.

Several days later, Bregor learned that Elena had not lived with Thomas for four months and that she had a restraining order against him. Elena told Bregor that she did not feel that the plaintiff was at physical risk, but that Thomas was not capable of providing the emotional support and guidance that the plaintiff required.

Bregor and her supervisor decided that the plaintiff should be removed from Thomas's care. The plaintiff resisted Bregor's attempts to remove her from Thomas's home. At some point, the plaintiff left Thomas's home and stayed with an aunt.

On January 20, 1983, Bregor placed the plaintiff in a supervised foster care home. The foster parent stated that Thomas was a source of the plaintiff's problems, specifically noting that the plaintiff behaved properly "[u]ntil visits with Uncle Tommy."

On January 26, 1983, the plaintiff's case was transferred from Bregor to Lapidus. Lapidus knew that Thomas was a problem in the plaintiff's life and there are references in Lapidus's case notes to this effect. On February 3, 1983, the court instructed DSS that visits between Thomas and the plaintiff be supervised.[7] Nevertheless, the plaintiff continued to have unsupervised visits with Thomas. The plaintiff saw Thomas or talked to him on the telephone every day. On August 17, 1983, the plaintiff's foster

---

[6]The plaintiff's mother had informed the Department of Social Services (DSS) before the initial placement hearing, and again at the hearing, that Thomas was the source of the plaintiff's problems.

[7]The plaintiff characterizes this instruction as a court order. DSS disagrees. It is not necessary that we resolve this conflict in order to address the plaintiff's appellate issues.

parents informed Lapidus of the plaintiff's continuing contact with Thomas.

In 1988, the plaintiff, who had developed an eating disorder, began therapy. In 1989, the plaintiff disclosed Thomas's sexual abuse to her relatives and, because of the severity of her eating disorder, entered an inpatient treatment program.

The plaintiff testified that she had loved Thomas and had not recognized his conduct as "abuse" or as the cause of her emotional and psychological problems until sometime in 1993. The plaintiff's therapy records indicate, however, that she recognized the link between Thomas's sexual abuse and her eating disorder as early as 1989. The plaintiff also testified that, although she knew that DSS placed her with Thomas in 1982, she did not realize that DSS had reason to know that he was an improper placement until February, 1993, when she talked with the district attorney about pressing criminal charges and learned that Elena had informed DSS about Thomas's initial deceit concerning his marital status.

2. *Discussion.* a. *The statute of limitations.* The governing tort statute of limitations requires that claims be brought within three years "after the cause of action accrue[s]." G. L. c. 258, § 4. Because the plaintiff's complaint was filed on November 16, 1995, her claims would be barred if they accrued on or before November 15, 1992. In certain cases, the discovery rule will stop the statute of limitations from running by postponing the accrual of a claim until a plaintiff discovers, or a reasonable person in the plaintiff's position should have discovered, that she had been harmed or may have been harmed by the defendant's conduct.[8] *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 205-206 (1990). *Mohr* v. *Commonwealth*, 421 Mass. 147, 156 (1995). The discovery rule applies to the plaintiff's tort claims against the Commonwealth. See *Phinney* v. *Morgan*, 39 Mass. App. Ct. 202, 204 (1995) (discovery rule applied to "tort actions arising out of incestuous child abuse against the nonperpe-

_____

[8]The discovery rule applies when the wrong is "inherently unknowable." *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983). The "inherently unknowable" standard is no different from and is used interchangeably with the "knew or should have known" standard. *Albrecht* v. *Clifford*, 436 Mass. 706, 714 (2002). *Williams* v. *Ely*, 423 Mass. 467, 473 n.7 (1996).

trator of the abuse"). Ordinarily, when a plaintiff knew or should have known of the existence of her cause of action is a factual issue to be decided by a trier of fact. *Riley* v. *Presnell*, 409 Mass. 239, 240 (1991).

Thus, a jury trial was held on the issue whether the statute of limitations barred the plaintiff's claims against the Commonwealth. The jury found, in answer to special questions, that the plaintiff knew or should have known on or before November 15, 1992, that Thomas had injured her, but that she did not know and should not have known on or before November 15, 1992, that she had been harmed by the conduct of DSS. Based on the jury's determination, the plaintiff was not barred by the statute of limitations from proceeding against the Commonwealth.

The Commonwealth moved for judgment notwithstanding the verdict, arguing that, as matter of law, if the plaintiff knew on or before November 15, 1992, that she had been harmed by Thomas, then she had sufficient notice on or before November 15, 1992, that she may have been harmed by DSS. The judge allowed the Commonwealth's motion, based on our holding in *Krasnow* v. *Allen*, 29 Mass. App. Ct. 562 (1990).[9]

We have recognized that "the discovery rule may be

[9]The plaintiff claims that the judge erred in applying *Krasnow* v. *Allen*, 29 Mass. App. Ct. 562 (1990), to the facts of this case. In *Krasnow*, the administrator of a patient's estate filed a complaint against the treating doctor for negligence. After the applicable period had elapsed for presentment of a claim against the Commonwealth, G. L. c. 258, § 4, the plaintiff learned that the doctor was a State employee, and attempted to bring suit against the Commonwealth. We held that the doctor's status as an employee of the Commonwealth was not inherently unknowable and that therefore the discovery rule did not delay the accrual of the claim against the Commonwealth for purposes of the presentment requirement. *Id.* at 566-570.

The plaintiff reasons that *Krasnow* is distinguishable because in *Krasnow* the Commonwealth's liability was premised on the doctor's negligence and the employee-employer relationship. Here, the plaintiff points out, although the harm was caused by Thomas's intentional conduct, the plaintiff's cause of action against the Commonwealth is grounded in the alleged negligence of the social workers. According to the plaintiff, as best we can discern her argument, the unknown fact in *Krasnow* related to the identity of a defendant and not to a separate, independent cause of action against a different defendant. While this may be a valid factual distinction, we think it does not make a legal difference: as explained *infra*, under the Massachusetts discovery rule, a claim will accrue with knowledge of harm and of a defendant's likely factual

somewhat more narrow in Massachusetts than in many other States where a cause of action accrues only when a plaintiff has notice of all the elements of a cause of action." *Krasnow* v. *Allen*, 29 Mass. App. Ct. at 569. "Massachusetts does not require discovery of each of the elements of the cause of action — duty, breach, causation, and damages before the limitation clock . . . starts ticking." *Id.* at 568-569, quoting from *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 382 (1986). "The [discovery rule] does not require that the plaintiff know or have reason to know that the defendant violated a legal duty to the plaintiff, but only that she knew or had reason to know that she had been harmed by the defendant's conduct." *Bowen* v. *Eli Lilly & Co.*, 408 Mass. at 206. "Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim." *Fidler* v. *Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir. 1983).

Here, DSS's allegedly actionable conduct is its purported failure to protect the plaintiff from sexual abuse by Thomas. We conclude that the plaintiff's claims against the Commonwealth were capable of being discovered through ordinary diligence and were not inherently unknowable, as matter of law.[10] The plaintiff knew on or before November 15, 1992, that she had suffered harm from Thomas. In fact, the plaintiff disclosed the abuse to her relatives in 1988, and her medical records indicate that she made a connection between the abuse and her injuries as early as 1989. There is no dispute that the plaintiff was aware both that she was in the legal custody of DSS and that DSS played a significant role in her placement. The plaintiff's claims against the Commonwealth were not, therefore, inherently unknowable. The plaintiff's knowledge of DSS's involvement was sufficient, at a minimum, to stimulate further inquiry concerning the Commonwealth's potential liability, including

connection to that harm; a plaintiff's knowledge of all elements of her legal claim is not required.

[10]The plaintiff claims that DSS controlled the information about the placement and urges us to conclude that this prevented her from discovering any claim against the Commonwealth. The record makes clear, however, that the triggering event from the plaintiff's perspective was information she obtained from speaking with Elena.

inquiry into the facts surrounding DSS's placement of her with Thomas or in failing to enforce the order that his visits be supervised.[11] In other words, "a reasonable person in the plaintiff's position would have been able to discern the harm or the cause of the harm" by November 15, 1992. *Riley* v. *Presnell,* 409 Mass. at 245.

b. *Evidentiary rulings.* The plaintiff challenges numerous evidentiary rulings, different in kind, and characterizes them as all relating to her "state of mind."[12] Examination of each challenge reveals that the evidence was properly excluded, either because it was not relevant or because the ruling was well within the judge's discretion to admit or exclude expert opinion.

Even if the evidence should have been admitted, the rulings did not prejudice the plaintiff. The plaintiff was permitted to tell the jury when she believed she made a connection between Thomas's abuse and her injuries. The plaintiff was also permitted to testify extensively about her circumstances and her thoughts and feelings about those circumstances. The judge permitted the plaintiff's expert, Dr. Brant, to explain dissociation and to testify to her diagnosis of the plaintiff. Dr. Brant

---

[11]In other jurisdictions, the outcome might be different. See, e.g., *Liuzzo* v. *United States,* 485 F. Supp. 1274, 1283 (E.D. Mich. 1980) (statute of limitations did not bar civil suit under Federal tort claims act against Federal government for murder of plaintiffs' mother ten years earlier, where plaintiffs had no suggestion that there was causative link between her death and conduct of Federal Bureau of Investigations); *Diamond* v. *Davis,* 680 A.2d 364, 380, 383 (D.C. 1996) (plaintiff's knowledge of wrongdoing on part of one defendant did not cause accrual of his cause of action against another, unknown defendant responsible for same harm, unless two defendants were closely connected, such as in superior-subordinate relationship); *Earle* v. *State,* 170 Vt. 183, 193 (1999) (abused child's cause of action against State social service agency did not accrue until he knew that his injuries may have been a result of breach of duty by agency).

[12]The evidence involved, for example, what she was feeling the day DSS placed her with Thomas; where she thought she might have to go if she could not stay with her uncle; why she did not tell her uncle to stop hugging her; what she first thought her uncle was trying to do when he got into bed with her; why she did not confront him; why she loved him; how she felt when the State tried to remove her from her uncle's home; when her expert witness thought the plaintiff "made the connection" between her eating disorders and the abuse; whether she was, in fact, a victim of sexual abuse; and whether her psychiatrist had concluded that the plaintiff considered herself to be a sexually abused person.

also testified about the general characteristics of sexual abuse and dissociation. The plaintiff testified that she suffered from dissociation, when she first connected her eating problems with the abuse, and why she had not made the association earlier. Her counsel was able to argue to the jury that the plaintiff did not know she had been harmed by Thomas's conduct on or before November 15, 1992, and that based on the circumstances in which the plaintiff found herself, a reasonable person would not know or have reason to know that she had been harmed by Thomas or DSS on or before November 15, 1992.

c. *Qualified immunity.* The plaintiff alleged that Bregor and Lapidus violated her constitutional rights under 42 U.S.C. § 1983, that is, her alleged rights not to be placed in an abusive home and to be protected by the State while she was in State custody.[13] Bregor and Lapidus moved for summary judgment, asserting that they were shielded from liability by the doctrine of qualified immunity. The motion judge agreed and allowed the motion for summary judgment.

"The doctrine of qualified immunity shields public officials who are performing discretionary functions, not ministerial in nature, from civil liability in § 1983 actions if at the time of the performance of the discretionary act, the constitutional or statutory right allegedly infringed was not 'clearly established.' " *Laubinger* v. *Department of Rev.,* 41 Mass. App. Ct. 598, 603 (1996), quoting from *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818 (1982). See *Breault* v. *Chairman of the Bd. of Fire Commrs. of Springfield,* 401 Mass. 26, 31-32 (1987), cert. denied sub nom. *Forastiere* v. *Breault,* 485 U.S. 906 (1988). The question is whether the plaintiff's rights were "clearly established" when Bregor and Lapidus were assigned to the plaintiff's case. See *Howcroft* v. *Peabody,* 51 Mass. App. Ct. 573, 595 (2001).

"The clearly established right is not one discernible at a high level of abstraction, for example the right to equal protection of the laws, but must be a particularized right. 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified im-

---

[13]We need not consider how the discovery rule might apply to the § 1983 claims. See *Pagliuca* v. *Boston,* 35 Mass. App. Ct. 820, 822 (1994).

munity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent.' " *Hutton* v. *Superintendent, Mass. Correctional Inst., Norfolk,* 45 Mass. App. Ct. 304, 307 (1998), quoting from *Anderson* v. *Creighton,* 483 U.S. 635, 640 (1987).

A review of the relevant Federal case law reveals that, at the time of the alleged violation, Bregor and Lapidus did not violate any "clearly established" rights of the plaintiff of which a reasonable person would have known.[14] During the relevant period of time, the rights asserted by the plaintiff had been recognized only in the Second Circuit. See *Doe* v. *New York City Dept. of Social Servs.,* 649 F.2d 134, 139-141 (2d Cir. 1981) (girl left in foster home for two years after child abuse expert told placement agency that foster father was sexually involved with child and recommended her immediate removal from foster home). See also *Doe* v. *Bobbitt,* 881 F.2d 510, 511 (7th Cir. 1989), cert. denied, 495 U.S. 956 (1990) (court unable to conclude that, in early 1984, substantial consensus existed that placing child in potentially dangerous environment in foster home was violation of due process clause); *Eugene D.* v. *Karman,* 889 F.2d 701, 711 (6th Cir. 1989) (right to personal safety in foster home was not clearly established Federal right in time period from 1974 through 1982).

The plaintiff's placement with a relative, rather than in foster care, further supports the conclusion that she has not asserted a right that was clearly established. See *K.H.* v. *Morgan,* 914 F.2d 846, 852 (7th Cir. 1990) (in context of claim against social service agency there is difference between placing child with family member and placing child with foster parent).

Even if a "clearly established" right existed, we would conclude that summary judgment was still appropriate because the plaintiff had not established that Bregor and Lapidus had intentionally violated her rights or were "deliberately indifferent" to her welfare. See *Doe* v. *New York City Dept. of Social Servs.,* 649 F.2d at 145. The plaintiff does not allege that Bregor and Lapidus acted intentionally. To establish that Bregor and

---

[14]We express no opinion whether such rights would exist today.

Lapidus acted recklessly or with callous indifference, the plaintiff would have to establish that Bregor and Lapidus believed or reasonably should have believed that their conduct very likely, but not certainly, would result in a violation of the plaintiff's rights. See *Germany* v. *Vance*, 868 F.2d 9, 18 & n.10 (1st Cir. 1989). There is no such evidence in this record.

Reduced to its essentials, the plaintiff's claim is that Bregor and Lapidus should have seen signs that the plaintiff was being sexually abused by Thomas. Here the failure to detect signs of sexual abuse may be sufficient to state a claim of negligence but is insufficient to establish a case of "deliberate indifference" under the Federal Constitution. See *Lintz* v. *Skipski*, 25 F.3d 304, 307 (6th Cir.), cert. denied, 513 U.S. 988 (1994).

*Judgment affirmed.*