**William FAY, Sr., et al.**

v.

**AETNA LIFE INSURANCE AND ANNUITY COMPANY and Gary Pflugfelder**

**No. CIV.A.01CV10846–RGS.**

United States District Court, D. Massachusetts.

March 5, 2004.

Robert J. Gilbert Gilbert & Renton, Andover, MA, for Frank J. Santangelo, Kathleen E. Fay, William L. Fay, Sr., Plaintiffs.

William Shields Day, Berry & Howard, Boston, MA, for Aetna Life Insurance Company, Defendant.

Mark E. Swirbalus Day, Berry & Howard, Boston, MA, for Aetna Life Insurance Company, Defendant.

Allan B. Taylor, Day, Berry & Howard, Hartford, CT, for Aetna Life Insurance Company, Gary E. Pflugfelder, Defendants.

Harrison V. Williams, Jr. Green & Siefter, Syracuse, NY, for Aetna Life Insurance Company, Gary E. Pflugfelder, Defendants.

*MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGEMENT*

STEARNS, District Judge.

On May 16, 2001, William Fay, Sr., Kathleen Fay, and Frank Santangelo, in his capacity as Trustee of the Fay Insurance Trust, filed this Complaint against Aetna Life Insurance and Annuity Company (Aetna), and a former Aetna general manager, Gary Pflugfelder, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and deceit, negligence, estoppel, and violation of G.L. c. 93A and c. 176D.[1] Plaintiffs maintain that Pflugfelder misrepresented the terms of a $6 million Aetna life insurance policy[2] that the Fays purchased for estate planning purposes in 1990 and in 1991. According to the Complaint, Pflugfelder assured the Fays that the policy required only ten, or at the most, eleven annual premium payments and would be paid in full upon their deaths. In fact, the policy sold by Pflugfelder to the Fays required that premiums be paid for twenty-eight years. Moreover, the policy provided that if either of the Fays reached the age of ninety-five, the $6 million death benefit would automatically lapse.[3] According to the Fays, they did not discover

1. The plaintiffs have plead, in the alternative, claims under New York General Business Law, §§ 349 and 350, and New York Insurance Law, §§ 2123 and 4226, in the event that the court finds that New York rather than Massachusetts law governs the case. As the parties agree (correctly) that Massachusetts law does apply, the New York law counts will be dismissed as redundant. The Complaint also pleads an equitable count of restitution. Where a contract governs the parties' relationship, the contract provides the measure of a plaintiff's rights and no action for unjust enrichment lies. *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1091, 1093 (9th Cir.

2003) (Delaware law); *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F.Supp. 340, 347 (D.Mass.1982) (federal common-law); *Popponesset Beach Ass'n, Inc. v. Marchillo*, 39 Mass.App.Ct. 586, 593, 658 N.E.2d 983 (1996) (Massachusetts law). Finally, plaintiffs seek a declaration of rights under the disputed policies.

2. Identical policies were issued for each of the Fays. For the sake of clarity, the court will refer to the dual policies as "the policy."

3. In this eventuality, the surviving Fay would receive the accumulated cash value of the deceased spouse's share of the policy.

the discrepancies between the policy they had purchased and the policy that Pflugfelder had described until December of 2000 when Aetna billed them for an eleventh annual premium.

On April 17, 2003, Aetna and Pflugfelder filed motions for summary judgment arguing that the Fays' Complaint is barred in its entirety by the statute of limitations.[4] On May 19, 2003, plaintiffs opposed the defendants' motions while simultaneously filing a cross-motion for partial summary judgment on the breach of contract claim.[5] On February 12, 2004, the court heard oral argument.[6]

## FACTS

Despite plaintiffs' vigorous efforts to demonstrate otherwise, for purposes of summary judgment the material facts are not in dispute.[7] In the light most favorable to the plaintiffs, they are as follows. Mr. Fay founded Faytex, a textile business, in 1978. Over time, the company grew into a multi-million dollar concern.[8] Fay, despite having never graduated from high school, holds five patents (one issued and four pending), and has extensive international business experience. In 1990, Fay's personal net worth exceeded $12 million.[9] Besides the policy at issue in this case, by 1990, Fay had acquired $1.2 million of life insurance.

Fay served on the board of directors of the Daniel Green Company with Pflugfelder, who at the time was a general manager at Aetna.[10] As a result of their shared experience as directors, Fay came to trust

4. Alternatively, defendants argue that the breach of contract claim must be dismissed because there has been no breach of the insurance agreement and that any reliance by the Fays on statements that Pflugfelder may have made was unreasonable as a matter of law.

5. Defendants argue that the cross-motion is untimely. They are correct that the cross-motion should have been filed by April 21, 2003, and is inappropriately included in the otherwise timely-filed opposition to the defendants' motions for summary judgment. However, the arguments raised by the cross-motion are so interwoven with the facts underlying the motions properly before the court that no prejudice will accrue to the defendants from considering the motion on its merits.

6. Also pending is defendants' motion to exclude the testimony of plaintiffs' expert witnesses, Theodore Affleck and William Hager.

7. Plaintiffs often confuse a disputed inference that might be drawn from a fact with the issue of whether the fact is disputed. As an example, plaintiffs argue that there is a dispute over the plaintiffs' degree of sophistication in insurance matters. It is undisputed, however, that Santangelo is a practicing attorney and a member of the Massachusetts bar and that Fay is a successful self-made businessman. Plaintiffs argue that because it cannot be assumed that lawyers and businessmen are necessarily sophisticated consumers of insurance, the court must completely disregard the occupations and experience of Santangelo and Fay. While the first proposition is true, the second is not.

8. Mrs. Fay is a Trustee of the Fay Insurance Trust but played no part in the contested transactions.

9. Fay's net worth in 2003 exceeded $18 million.

10. Plaintiffs seek to equate Pflugfelder's position as an Aetna general manager with that of an Aetna corporate officer possessing the authority to alter or amend the terms of a policy. The court permitted a special round of discovery on plaintiffs' contention in this regard and the parties have briefed the issue separately. It is beyond dispute that Pflugfelder was not imbued with an officer's authority. Aetna's Corporate Resolutions do not list general managers among the corporate officers empowered to sign, and thus alter, the terms of a policy. Moreover, the Assignment of Authority specifically drafted for Pflugfelder does not grant him such a privilege, and nothing in the deposition testimony of Aetna's Rule 30(b)(6) witness is to the contrary.

Pflugfelder and rely on his judgment. In 1990, Pflugfelder suggested that Fay consider buying life insurance from Aetna as a means of adding liquidity to his estate. Fay tentatively agreed. In 1990, Santangelo, who since 1980 had acted as Fay's personal attorney, assisted Fay in the negotiations with Pflugfelder. During the discussions with Pflugfelder, Fay made it clear that he wanted a policy that would require him to make premium payments for no more than ten years.

In a November 13, 1990 letter, Pflugfelder recommended the purchase of an Aetna Flexible Premium Adjustable Life Insurance Policy, which he described as having a "ten year premium paying period."

Six million dollars of Life Insurance coverage on both you and Kay [Fay] will cost $111,900 per year for ten years. Total cost if both of you live for the ten year premium paying period [is] *$1,190,000.* If either of you should pass away during the ten year premium paying period, the policy would immediately be fully paid up (no further premiums required) for $6,000,000 which would then be paid to the Trust at the second death.

On December 19, 1990, Pflugfelder sold the recommended policy to the Fays.[11] Pflugfelder told Fay and Santangelo that because of the size of the annual premiums (over $100,000 a year), the policy should over ten years accumulate sufficient equity to relieve the Fays from making further premium payments. Pflugfelder cautioned that if interest rates were to drop, an eleventh premium payment of no more than $12,000 might be required. Pflugfelder assured Fay that the policy would remain in force until both he and his wife had died.[12]

The Fays signed a Policy Application, which over the signature line contained the following warranty.

I agree that no agent may alter the terms of the application, the Temporary Insurance Agreement or the policy. No agent may waive any of Aetna's rights or requirements.

The policy was then delivered to Mr. Fay and Santangelo. Both Fay and Santangelo concede that they never read the policy. The cover page to the policy stated:

Right of Policy Examination: All premiums will be refunded if this policy is returned to Aetna ... for cancellation within 10 days after it is delivered. The policy will then be deemed void from its beginning.

The policy further stated that:

The Policy and the application are the whole contract.... Only an officer of Aetna may agree to a change in the policy, and then only in writing.

Premiums: No benefit will be provided on the basis of a premium until that premium is paid. Premiums are payable until the Maturity Date.

MATURITY DATE: DECEMBER 13, 2019.[13]

THIS POLICY MAY TERMINATE PRIOR TO THE MATURITY DATE IF PREMIUMS PAID AND INTER-

11. Pflugfelder, as an Aetna general manager, could not serve as the commissioned agent on the sale. Consequently, the commission was paid to Mr. Fay's son-in-law, David Stangl, a stockbroker who also possessed an insurance license. Fay consulted with Stangl generally about insurance matters, but testified that he and Stangl never discussed the contents of the policy.

12. It will be apparent to the reader that Pflugfelder was promoting a so-called "vanishing premiums" policy, an ill-starred insurance product that has been the subject of much litigation.

13. This is the date upon which Mr. Fay would turn ninety-five.

EST CREDITED ARE INSUFFICIENT TO CONTINUE COVERAGE TO THAT DATE. PLEASE SEE YOUR STATEMENT OF POLICY COST AND BENEFIT INFORMATION FOR FURTHER DETAILS.

THE PLANNED PREMIUM AMOUNT SHOWN ABOVE MAY NOT CONTINUE THE POLICY IN FORCE TO THE MATURITY DATE EVEN IF THIS AMOUNT IS PAID AS SCHEDULED. THE PERIOD FOR WHICH THE POLICY WILL CONTINUE WILL DEPEND ON ... CHANGES IN INTEREST CREDITS AND MORTALITY DEDUCTIONS.

The Statement of Policy Costs and Benefit Information stated that the PERIOD OF COVERAGE is 29 YEARS, and that the policy would stay in force as long as the premiums and credited interest were sufficient, BUT NOT AFTER DECEMBER 13, 2019.[14]

IMPORTANT NOTICE: THE PROJECTED RESULTS OF YOUR INSURANCE PROGRAM MAY CHANGE WITH VARIATIONS IN THE INTEREST RATE CREDITED BY AETNA .... YOU SHOULD READ AND STUDY YOUR POLICY AND POLICY SUMMARY VERY CAREFULLY....

CURRENT BENEFITS ARE BASED ON CURRENT RATES AND ARE NOT GUARANTEED. THE CURRENTLY PAID ANNUAL INTEREST RATE IS 8.25% TO THE END OF YEAR 10 AND 8.75% THEREAFTER. IF THE CURRENT COST OF INSURANCE AND THE CURRENT INTEREST RATE ARE CHANGED, BENEFITS MAY BE MORE OR LESS THAN THE AMOUNTS SHOWN BUT NOT LESS THAN THE GUARANTEED BENEFITS.

GUARANTEED BENEFITS ARE BASED ON ... AN ANNUAL INTEREST RATE OF 4.50%

On December 19, 1991, the policy was reissued for estate planning reasons. The 1991 policy was in all material aspects identical to the 1990 policy. Before the 1991 policy was delivered (in early 1992), Pflugfelder sent Santangelo two letters iterating his previous description of the policy's terms. In the second letter, dated January 13, 1992, Pflugfelder wrote that:

[t]he Base Policies were Universal Life. This is an interest sensitive policy in which the premium to be paid assumes a rate of interest to be earned and credited by the Insurance Company. The rate of interest at the time of our presentation that we were crediting was 8.25%. Assuming that we could continue to credit that rate of interest each year for Ten Years, the premium would be the quoted annual premium of $111,967. If the credited interest rate increased, the premium to be billed would decrease. If, on the other hand, the credited interest rate dropped, either the annual premium would increase modestly or the [sic] The Payments would not be enough to carry the policy and some monies would have to be paid in the Eleventh Policy Year....

However, we must be mindful that these two policies are 'interest-rate sensitive' should the credited interest drop, either the annual premium would have to be actuarially increased to offset the loss of interest, or alternatively, the premium payment period could be lengthened and a payment of whatever amount was required could be made in the Eleventh Year.

the PREMIUM PAYMENT PERIOD was accordingly listed as 26 YEARS.

**14.** The period of coverage for Mrs. Fay, who was older than Mr. Fay, was 26 YEARS and

Pflugfelder delivered the reissued policy to Fay and Santangelo on February 27, 1992. Neither plaintiff read it. In an affidavit, Fay offered the following explanation of why neither he nor Santangelo bothered to read the policies.

At no time did I ever ask Mr. Santangelo or anybody else to read the Aetna policies. I did not think it was necessary. Mr. Pflugfelder was an insurance expert and a trusted fellow board member, and I had no reason to doubt or distrust his word. Mr. Santangelo, on the other hand, was a lawyer in general practice, and I had no reason to believe that he knew any more about insurance than I did. In fact, he told me when I first asked him to be the successor trustee that he knew nothing about life insurance and could not advise me as to what insurance I should purchase.... He was not hired to read the policies or check up on Mr. Pflugfelder or provide insurance advice of any kind. As for my son-in-law, David Stangl, he is primarily a stockbroker who also has an insurance license, and I believed that his knowledge of life insurance in 1990 was extremely limited. I did not consult with Mr. Stangl (and I told Mr. Pflugfelder that I was not consulting with Mr. Stangl) about the substance of the Aetna polices ....

Fay Affidavit, ¶ 7.

As the Trustee of the Fay Insurance Trust, Santangelo received Annual Reports from Aetna discussing the performance of the policy, which he forwarded to Mr. Fay. The 1992 Report contained a table showing that interest rates had dropped from an initial rate of 8 percent in December of 1991 to 6.75 percent at the beginning of November of 1992. The table read as follows.

Interest rate of new premiums received during the report period

| BEGINNING | TO | INTEREST RATE |
| --- | --- | --- |
| 12–19–91 | 12–31–91 | 8.00% |
| 01–01–92 | 01–31–92 | 7.75% |
| 02–01–92 | 09–30–92 | 7.50% |
| 10–01–92 | 10–31–92 | 7.00% |
| 11–01–92 | PRESENT | 6.75% |

The Report concluded with the following warning.

Additional premiums may be required to keep this policy in force.... If no more than planned premiums are paid, this policy will lapse for insufficient value on

(A) 08–19–00, assuming interest and deductions at the guaranteed rates.

(B) 00–00–00, assuming interest and deductions at the current rates.... If no date appears, the policy would continue to maturity.

Fay and Santangelo disregarded the 1992 warning about interest rates (as well as similar warnings in subsequent Annual Reports). According to plaintiffs, Pflugfelder periodically wrote to them offering misleading interpretations of the Reports and sometimes selectively highlighting the contents to obscure the meaning.[15] Plaintiffs point to a letter of January 26, 1993, in which Pflugfelder assured them that "[w]e have established a pattern that will continue to work well on a year to year basis."

Pflugfelder opted for early retirement from Aetna in August of 1992.[16] Thereafter, he worked as an independent "insur-

---

**15.** Plaintiffs do not dispute the fact that the Reports accurately stated the premium totals and the applicable interest rates. Rather, they complain that Pflugfelder's misrepresentations caused them to ignore the disclosures.

**16.** Pflugfelder spent his last year at Aetna managing the life insurance department in Aetna's Syracuse office. After August of 1991, he no longer held the title of a general manager. Although Pflugfelder performed no duties at Aetna after August of 1992, his official retirement from Aetna did not take place until his severance benefits expired in August of 1993.

ance agent/consultant" selling Aetna products. Although no longer employed at Aetna, Pflugfelder continued to correspond with the plaintiffs on insurance matters. On January 28, 1997, Santangelo wrote Pflugfelder seeking assurance that the Fays' final payment on the policy would take place in December of 1999. On May 14, 1997, Pflugfelder replied.

That leads me to the final issue to be addressed, the payment of future premiums. Both policies are Flexible Premium, interest sensitive policies. The original assumptions were based on the fact that the interest rate credited to the policy cash values would be high enough to create sufficient equity at the end of ten premium payment years to carry the policies without further premium payments being required. We will not know that for certain until the premiums due December 18, 1999 have been paid.[17]

In December of 2000, Aetna billed the Fays for an eleventh annual premium in excess of $100,000. The bill prompted plaintiffs to read the polices. When they did, they came to the realization that they had been misled about the premium obligations and the expiration date of the policy. They filed this Complaint on May 16, 2001.

## DISCUSSION

Defendants argue that because the Amended Complaint was filed almost four years after the date on which the last of the applicable statute of limitations had run, the plaintiffs' claims are entirely barred. Massachusetts imposes a six-year statute of limitations on claims for breach of contract and breach of the implied duty of good faith and fair dealing. G.L. c. 260, § 2.[18] "The general rule is that a contract action accrues at the time the contract is breached." *Berkshire Mutual Ins. Co. v. Burbank*, 422 Mass. 659, 661, 664 N.E.2d 1188 (1996). The statute of limitations is an affirmative defense on which defendants bear the initial burden of proof. *Coastal Oil New England, Inc. v. Citizens Fuels Corp.*, 38 Mass.App.Ct. 26, 29 n. 3, 644 N.E.2d 258 (1995). However, "[w]here summary judgment is sought on the basis of a statute of limitations, once the defendant establishes that the time period between the plaintiff's injury and the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the plaintiff bears the burden of alleging facts which would take his or her claim outside the statute." *McGuinness v. Cotter*, 412 Mass. 617, 620, 591 N.E.2d 659 (1992).

Defendants argue that the breach (if any) of the insurance contract occurred when Aetna delivered policies that did not conform to the Fays' specifications. *See Szymanski v. Boston Mut. Life Ins. Co.*, 56 Mass.App.Ct. 367, 383, 778 N.E.2d 16 (2002). Consequently, the cause of action accrued at the latest on February 27, 1992, when the reissued policy was delivered to the Fays. The statute of limitations therefore ran six years later on February 27, 1998, more than four years before the date on which the Complaint was filed.

---

17. Plaintiffs place special emphasis on this response, which they characterize as deceptive and therefore significant in any limitations tolling analysis. As an initial matter, it is not clear that Pflugfelder's letter, with its couched predictions, was in fact misleading. More significantly, it is difficult to see how Pflugfelder's representations could be attributed to a company from which he had retired five years earlier.

18. A six-year statute of limitations also applies to unjust enrichment claims. *Palandjian v. Pahlavi*, 614 F.Supp. 1569, 1577 (D.Mass. 1985). The remaining claims have shorter statutes of limitations. Consequently, I have addressed the limitations issue in terms of the six-year period most favorable to the plaintiffs.

■ While plaintiffs dispute *Szymanski's* conclusion that the breach occurred on the delivery of the policy, they nonetheless maintain that Pflugfelder's misrepresentations concealed the fact that they had been injured. As a matter of fairness, the statute of limitations is tolled under Massachusetts law, as it is in most jurisdictions, when a plaintiff has been harmed by an "inherently unknowable" wrong. *Flynn v. Associated Press*, 401 Mass. 776, 781, 519 N.E.2d 1304 (1988). There are limits, however. The "inherently unknowable" standard is no different than the "knew or should have known" standard, or as it is more often termed, the discovery rule. *Szymanski*, 56 Mass.App.Ct. at 371, 778 N.E.2d 16. "The discovery rule starts a limitations period running when events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed." *Felton v. Labor Relations Commission*, 33 Mass.App.Ct. 926, 928, 598 N.E.2d 687 (1992). The issue, it must be stressed, is not one of actual notice. Rather, "the action accrues when the injured party knew or, *in the exercise of reasonable dili-*

*gence, should have known*, the factual basis for the cause of action." *Tagliente v. Himmer*, 949 F.2d 1, 4 (1st Cir.1991) (emphasis in original). Stated another way, a cause of action accrues when a plaintiff has "(1) knowledge *or sufficient notice* that she was harmed and (2) knowledge *or sufficient notice* of what the cause of harm was." *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 208, 557 N.E.2d 739 (1990) (emphasis supplied). *See also Hendrickson v. Sears*, 365 Mass. 83, 90, 310 N.E.2d 131 (1974) ("[A] cause of action accrues on the happening of an event likely to put the plaintiff on notice.").[19]

■ Defendants make the unassailable argument that plaintiffs were on notice of their injury when the policy was delivered because all they had to do was read it to know that it was something other than what they had anticipated. Moreover, even if plaintiffs might not have grasped the full extent of the injury from the language of the policy, it would have become apparent had they heeded the 1992 Annual Report.[20] *See Bowen*, 408 Mass. at 206–207, 557 N.E.2d 739 (the discovery rule

---

**19.** The rule is different under G.L. c. 260, § 12, if the wrongdoer in breach of a fiduciary duty of full disclosure "keeps from the person injured knowledge of the facts giving rise to a cause of action and the means for acquiring knowledge of such facts." *Frank Cooke, Inc. v. Hurwitz*, 10 Mass.App.Ct. 99, 106, 406 N.E.2d 678 (1980). "An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G.L. c. 260, § 12. Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary.... The plaintiff is not required to have made an independent investigation." *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 519–520, 677 N.E.2d 159 (1997). This rule does not, however, assist plaintiffs as the relationship between an insurer and a policy holder does not entail a fiduciary duty. *Szymanski*, 56 Mass. App.Ct. at 381–382, 778 N.E.2d 16, citing

*Rapp v. Lester L. Burdick, Inc.*, 336 Mass. 438, 442, 146 N.E.2d 368 (1957). Moreover, plaintiffs' contention that Pflugfelder owed a fiduciary duty to Fay in insurance matters because of their co-service as directors on the board of an unrelated company has no basis in law. Plaintiffs confuse the fiduciary duty directors owe their corporation and its shareholders with the social obligations that flow from a private friendship.

**20.** When plaintiffs were asked at their depositions, whether having at last read the policy, they understood from its language that premiums were required to be paid until 2019 (in Mr. Fay's case) and that the policy expired when (or if) he reached age ninety-five, both Fay and Santangelo admitted that they did. In this respect, the plaintiffs' case differs from *Szymanski*, the case that would superficially appear the most helpful to their cause. In *Szymanski*, the vanishing premiums policy issued by the defendant, unlike those in the

requires only reasonable notice of harm, it does not require notice of the full extent of a plaintiff's injury); *Olsen v. Bell Tel. Laboratories, Inc.,* 388 Mass. 171, 175, 445 N.E.2d 609 (1983) (same); *Sheila S. v. Commonwealth,* 57 Mass.App.Ct. 423, 428, 783 N.E.2d 868 (2003) (same).[21] *Cf. Spritz v. Lishner,* 355 Mass. 162, 164, 243 N.E.2d 163 (1969) (one who signs a contract will be held to its provisions whether or not he has read it or claims not to have understood its provisions); *Simon v. Simon,* 35 Mass.App.Ct. 705, 714, 625 N.E.2d 564 (1994) (same).[22]

Defendants cite as persuasive authority a pertinent and recent First Circuit deci-

sion, *Loguidice v. Metropolitan Life Ins. Co.,* 336 F.3d 1, 7 (1st Cir.2003). In *Loguidice,* the plaintiff, who had purchased a whole life insurance policy that was falsely represented as a retirement plan, argued that because of the misrepresentation, she was entitled to the tolling benefit of the Massachusetts discovery rule.

Loguidice's argument that the wrongs she suffered were inherently unknowable until she read the newspaper article about the class-action settlement is undercut by our unwillingness to hand down expansive interpretations of state law at the request of diversity plaintiffs.... Loguidice concedes that she

cases cited by the Appeals Court where a contrary result was reached, *see, e.g., In re Northwestern Mut. Life Ins. Co. Sales Practices Litig.,* 70 F.Supp.2d 466 (D.N.J.1999), *aff'd,* 259 F.3d 717 (3d Cir.2001), contained false information about the insurer's historical return on investment, presented inconsistent and confusing illustrations of the policy's predicted future value, and gave false assurances that the policy would develop cash value upon the "vanishing" of the premiums. Similarly, the annual reports issued by the insurer repeated these falsehoods without including any clarifying information about the actual performance of the policy. Perhaps of greater significance is the fact that the issue in *Szymanski* was not whether the plaintiff had read the policy and the annual reports, but whether having read them, he should have understood the policy to be the apple rather than the orange he had bargained for. On that issue, the Appeals Court held that there was a material dispute of fact. *Szymanski,* 56 Mass. App.Ct. at 380, 778 N.E.2d 16.

**21.** "[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact." *Riley v. Presnell,* 409 Mass. 239, 240, 565 N.E.2d 780 (1991). The contrary instances are those (as here) where plaintiffs as a matter of law fail to sustain their burden of showing that their action was timely. *See Phinney v. Morgan,* 39 Mass.App.Ct. 202, 209, 654 N.E.2d 77 (1995) (concluding as a matter of law that plaintiffs, while not aware of the full extent of their psychological injuries stemming from child-

hood sexual abuse, possessed knowledge or sufficient notice that they had been harmed and what the cause of the harm was); *Doe v. Creighton,* 439 Mass. 281, 285, 786 N.E.2d 1211 (2003) (same).

**22.** Plaintiffs cite *John Hancock Mut. Life Ins. Co. v. Schwarzer,* 354 Mass. 327, 330 n. 3, 237 N.E.2d 50 (1968), as holding that the usual rule that a party to a contract is charged with its terms whether he reads them or not does not apply in an insurance context. This is a serious misreading of the case. In *Schwarzer,* an agent made knowingly false entries on an insurance application that was never shown to the insured. On the basis of the agent's false statements, the insurer sought to avoid the policy. Obviously troubled by the insurer's litigating tactic, the Court held that the "well established principle ... that the acceptance of a contract establishes all its terms" will give way "where the elements of equitable estoppel are present." The language cited by the plaintiffs for the proposition that the law does not impose a duty on an insured to read a policy is not part of the holding of the case, but is taken from a footnote quoting a law review article criticizing a New York state court decision for an overly rigid and inequitable application of the absolute rule. The *Schwarzer* equitable estoppel rule applies only when an insurer attempts to escape the obligations of its policy on the basis of errors for which it (or its agent) is solely responsible. *See Sullivan v. The Manhattan Life Ins. Co. of N.Y.,* 626 F.2d 1080, 1083 (1st Cir.1980).

did not read through the folder [the Agent] left with her when he delivered her "plan" until after instituting this litigation. Had she looked at the materials in the folder earlier, a reasonable fact finder would have to conclude, she would have learned that there was nothing in the folder that could have constituted part of the retirement plan she thought that she had purchased other than the life insurance policy, which was distinctively so labeled. The Massachusetts courts require plaintiffs seeking to invoke the discovery rule to read the monthly statements sent by their securities broker, *see Patsos*, 433 Mass. at 327, 741 N.E.2d 841, and seemingly assume that they also must read their insurance policies, any illustrations that accompany the policies, and their annual statements, *see Szymanski*, 56 Mass.App.Ct. 367, 371, 778 N.E.2d 16 (2002). We therefore have no reason to expect that the Massachusetts courts would forgive Loguidice's failure to read through her folder. Because such a read-through would have put Loguidice on inquiry notice of her claims, the discovery rule

does not save those claims. *See Patsos*, at 327, 741 N.E.2d 841.[23]

Plaintiffs are unable to offer a principled distinction that would take their case out of the rule laid out in *Loguidice*. If anything, the circumstances of *Loguidice* are more compelling than anything the Fays can point to. The plaintiff in *Loguidice* was a nurse and divorced mother of two who had neither business experience nor the opportunity to consult with a lawyer or an independent insurance licensee as did the Fays.[24]

Perhaps recognizing the futility of any resort to the discovery rule, plaintiffs emphasize an alternative argument, that the statute of limitations is irrelevant because the case is not "ripe."

Defendants argue that the statute of limitations supposedly expired before the lawsuit was filed. This argument is also without merit. To establish a successful statute of limitations defense, Defendants first must prove that the causes of action "accrued" outside the limitations period, and then establish that the running of the statute of limitations was not tolled. Defendants con-

---

**23.** In *Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 146 (1st Cir.2004), the First Circuit elaborated on its holding in *Loguidice*.

We are unpersuaded by Maccabees' argument that our decision in *Loguidice v. Metro. Life Ins. Co.*, 336 F.3d 1 (1st Cir.2003), requires us to find that Foisy had knowledge of her claims as far back as 1994. In *Loguidice*, despite a sympathetic factual background in which an unsavory insurance agent misled the plaintiff into believing she purchased a retirement plan when in fact she purchased life insurance, we held that the claims were barred because the language of the policy clearly indicated it was life insurance, thus putting the plaintiff on inquiry notice of her claim. *See id.* at 7. Here, however, because the language in Maccabees' policy is ambiguous, *see infra* at 148, Foisy could not be expected to have had knowledge of a particular construction of the policy.

As it is undisputed that the language of the Aetna policy unambiguously set out the insurance term and the number of required premiums, the Fays' policy is like the policy in *Loguidice* and unlike the one that figured in *Foisy*.

**24.** In *Szymanski*, the Appeals Court favorably noted the decision in *McCord v. Minnesota Mut. Life Ins. Co.*, 138 F.Supp.2d 1180, 1184–1185 nn. 5, 6 (D.Minn.2001), where the court found it significant that the plaintiffs, who had purchased "vanishing premium" policies, "were experienced businessmen, one who 'owned his own business, bought and sold real property, conducted title searches, executed and carried out business contracts ...,' another the 'president of a company in which he owns an interest, interacts frequently with lawyers and accountants, and has owned life insurance policies ....'" *Szymanski*, 56 Mass.App.Ct. at 379 n. 10, 778 N.E.2d 16.

flate these issues by "morphing" the tolling analysis into the accrual analysis. As will be shown, however, the causes of action did not accrue at earliest until the Year 2000, when Aetna's customer service representative said that premiums would be due from the Fays "for life," and then followed up with a new premium bill in December 2000.

Plaintiffs' Opposition, at 3.[25] This argument takes its inspiration from the *Szymanski* case where the plaintiff argued that a cause of action under a "vanishing premiums" policy does not accrue until the policy holder receives the first premium bill beyond the year when the payments were supposed to end. *Szymanski,* however, is of no help to the plaintiffs. While noting that the plaintiff's argument had achieved occasional success, particularly in the New York state courts, the Massachusetts Appeals Court rejected it.

> [T]he rules for the accrual of causes of action in Massachusetts differ from some other jurisdictions, notably New York. On balance, the pertinent inquiry here with regard to accrual is not when the plaintiff first had to pay unanticipated premiums or what death benefit his policy would have paid had he died before 1996, but rather, when the plaintiff was on notice that he had purchased a policy that was to cost him far more than originally represented.

*Szymanski,* 56 Mass.App.Ct. at 383, 778 N.E.2d 16.[26]

#### ORDER

For the foregoing reasons, defendants' motions for summary judgment are *ALLOWED.* Plaintiffs' cross-motion for summary judgment on the breach of contract claim is *DENIED.* Defendants' motion to exclude the testimony of plaintiffs' expert witnesses is *MOOT.* Defendants shall submit within ten (10) days of the date of this Order a proposed form of Final Judgment consistent with the court's rulings.

SO ORDERED.

---

**25.** Plaintiffs misstate the burden of proof. It is their obligation to demonstrate facts justifying the tolling of the statute. There is no burden on the defendants to do so. *McGuinness,* 412 Mass. at 620, 591 N.E.2d 659.

**26.** If one follows the logic of plaintiffs' argument, a cause of action based on Pflugfelder's alleged misrepresentation that the policy would never expire would only become "ripe" in 2019 when Mr. Fay turned 95 years old (should he live that long).